INTERNATIONAL ARTISTS, LTD., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WALTER V. LIBERACE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1569–68, 1570–68. Filed October 22, 1970.

*Adam Y. Bennion, Victor L. Walch, A. Calder Mackay,* and *Richard N. Mackay,* for the petitioners.

*Myron A. Weiss,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| | TYE May 31— | Deficiency |
|---|---|---|
| | 1963 | $17, 652. 88 |
| International Artists, Ltd., docket No. 1569–68 | 1964 | 26, 264. 23 |
| | 1965 | 22, 429. 71 |

| | TYE Dec. 31— | |
|---|---|---|
| | 1962 | 12, 937. 75 |
| Walter V. Liberace, docket No. 1570–68 | 1963 | 24, 233. 20 |
| | 1964 | 23, 483. 50 |

The issues presented for decision are: (1) Whether the corporate petitioner is entitled to a deduction for depreciation and operating expenses with respect to realty owned by the corporate petitioner and used in part by its controlling shareholder as a personal residence; and, if so, the amount thereof.

(2) Whether the individual petitioner has received a constructive dividend as a result of his use of said realty, in part, as his personal residence; and, if so, the amount so received.

#### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, together with exhibits attached thereto, is incorporated herein by this reference.

The individual petitioner herein, Walter V. Liberace (hereinafter sometimes referred to as petitioner), is a well-known musician and entertainer. Petitioner was not married during the period in question. He filed his Federal income tax returns for the calendar years 1962, 1963, and 1964 with the district director of internal revenue, Los Angeles, Calif. Petitioner resided in Los Angeles, Calif., at the time of the filing of the petition in this case.

International Artists, Ltd., the corporate petitioner herein (hereinafter sometimes referred to as the corporation), filed Federal income tax returns with the district director of internal revenue, Los Angeles, Calif., for the fiscal years ending May 31, 1963, 1964, and 1965. Its principal place of business at the time the petition in this case was filed was Los Angeles, Calif.

The corporation was organized in 1954 under the laws of the State of California for the purpose of producing and promoting concerts featuring Liberace as the principal attraction. The corporation derived its income during the taxable years at issue primarily from sources related to Liberace's performance as an entertainer in nightclubs and television appearances and from royalties with respect to the sale of records. Upon its organization a total of 100 shares of stock was issued by the corporation, as follows: 54 shares to petitioner; 27 shares to George Liberace, a brother of petitioner; and 19 shares to John R. Jacobs, Jr., petitioner's business manager. In 1957 the corporation redeemed the stock held by George Liberace. Following the redemption a total of 73 shares remained outstanding, 54 of which were owned by petitioner and 19 by Jacobs. Petitioner owned approximately 74 percent and Jacobs approximately 26 percent of the stock of the corporation during the taxable years in question.

In its articles of incorporation the law office of Jacobs, located in the Taft Building, 1680 North Vine Street, Hollywood, Calif., was designated as the corporation's principal place of business. The books and records of International Artists were kept in this office until 1968, at which time they were transferred to an office at 971 North La Cienega Street, Los Angeles, Calif. Lucille Cunningham, employed as a secretary by the corporation, was placed in charge of the latter office.

The business operations of International Artists were successful during the early 1950's.[1] The demand for Liberace performances was relatively great during this period. In addition to his appearances in nightclubs, petitioner led a weekly television show from 1952 to 1955. Partially as a result of overexposure on television, however, petitioner's popularity as an entertainer waned in the latter part of the 1950's, causing gross earnings of the corporation to fall sharply from $50,000 to $6,000 per week. The overexposure on television resulted from frequent reruns of his program following the close of the original television series in 1955.

Petitioner's public image during his period of success in the early part of the 1950's is described by him as one of "glamour and elegance." This image was conveyed to the public by means of elegant costumes, and unusual musical instruments and stage settings. It was calculated to arouse the interest of the public and draw spectators. The emphasis, in Liberace performances, had been as much upon the visible spectacle of his show as upon his musical talent. Nevertheless, in 1958, at the urging of his business manager, and prompted by his loss of popu-

---

[1] Reference here to the business operations of International Artists includes the period prior to the incorporation in 1954 during which the Liberace show operated in noncorporate form.

larity and reduced income, petitioner discarded the elegant image in favor of a more conservative one. His life style shifted from the spectacular to the conventional. However, this change failed to improve the deteriorating financial condition of the business and, in fact, contributed to its further decline. A second television series initiated in 1958 was forced to close after 26 weeks because of Liberace's diminished popularity.

In 1960, in an effort to revitalize the corporate business, the officers of the corporation resolved to reintroduce the previously successful "elegant" image of petitioner. Their efforts in this regard met with success. Corporate gross earnings in the ensuing 5 years steadily climbed from $300,000 per year to in excess of $1 million per year. The image of glamour accomplished by means of Liberace's unusual attire and stage settings was instrumental in capturing the public's interest. In addition, the effects of previous overexposure disappeared with the passage of time.

In 1960, to provide in part for a suitable location for the preparation of the corporate musical productions, as well as to provide a home for Liberace which would enhance his image in the eyes of the public, International Artists acquired a large house, for approximately $95,000, in a residential section of Los Angeles, overlooking the Los Angeles Basin. These premises (hereafter referred to as Harold Way), which are the subject of controversy in the instant case, are located at 8433 Harold Way in the Hollywood Hills area of Los Angeles. The house was thereupon lavishly decorated and furnished (pursuant to the joint specifications of Liberace and other corporate officers) at a total cost to the corporation of approximately $250,000. Included in the improvements to the home were several items specifically designed to prepare the premises for its intended use in the production of musical programs, such as a soundproof music room, theatrical lighting, a projection room, and a specially designed wardrobe closet. In appearance, however, the home was simply the spectacular personal residence of Liberace. Though used to a substantial extent as a studio and home office of the corporation, as hereinafter described, Harold Way was commonly regarded as the residence of petitioner. A studio was not rented by the corporation, in part because the available studios were regarded by petitioner as ill-equipped for his purposes and because they could not provide the necessary privacy. The corporate resolution pursuant to which the Harold Way premises were purchased provided:

RESOLVED that this corporation purchase the improved real property located at 8433 Harold Way, Los Angeles, California, provided such can be done within a purchase price of $95,000.00 and suitable financing arranged for, and that said purchase, if acceptable to the owners, be completed on or before December 31, 1960.

BE IT FURTHER RESOLVED that the Secretary of the corporation, Mr. John R. Jacobs, jr., is authorized and empowered to negotiate for the purchase of such property, as hereinabove stated, and to execute escrow instructions and other documents reasonably required to complete any purchase agreed upon.

BE IT FURTHER RESOLVED that, in the event the purchase of the Harold Way property is not completed, that Mr. Jacobs be directed to continue investigating other properties in the Hollywood area which might be suitable to meet the needs of the corporation.

The furniture of Harold Way was acquired by the corporation from Liberace, who in addition to his activities as a musician was the proprietor of an antique shop in Los Angeles. The house was exquisitely furnished primarily in antique-styled furniture.

The approximate size of Harold Way, according to diagrams introduced jointly into evidence, is 123 feet in length and 55 feet in width. The house is surrounded by sculptured grounds, in the rear portion of which are situated a cabana and swimming pool. The house itself is a three-story structure containing approximately 28 rooms. A brief description of the three floors of Harold Way is set forth below:

| *First Floor* | *Second Floor* | *Third Floor* |
|---|---|---|
| (1) "studio" | (1) living room | (1) 2 bedrooms |
| (2) living room | (2) dining room | (2) 3 sitting rooms |
| (3) 3 storage closets | (3) bar and lounge | (3) 11 storage areas |
| (4) 2 restrooms | (4) organ equipment | (4) 3 restrooms |
| (5) kitchen | storage room | (5) dressing room |
| (6) dining room | (5) 2 restrooms | |
| (7) projection room | (6) 3 sitting rooms | |
| | (7) bedroom | |

The first-floor studio and living room are 33 × 21 feet and 27 × 30 feet, respectively, and together dominate the floor in both size and importance. The studio contains conference equipment, two pianos, and is soundproof. The living room is elaborately furnished and also contains two pianos. Attached to the living room is an alcove, 12 × 15 feet in size, referred to by employees of International Artists as the "stage." The second floor similarly has two prominent rooms, the living and dining rooms. The former is the largest and most exquisitely furnished room in the house. It contains, as does the first-floor living room, an elevated alcove similarly referred to as a stage, 13 × 21 feet in size.

The shows presented by International Artists required extensive preparation, particularly prior to the start of a musical season. The season generally began about the 10th of January. Preparation of the programs involved, preliminarily, the arrangement, choice, and composition of musical numbers. While this was generally done at the beginning of the season, mid-season additions of musical numbers requiring additional preparation were not uncommon. The formula-

tion of a program was the responsibility of petitioner and Gordon Robinson, the musical director of the corporation. During this stage of preparation, Liberace and Robinson typically met in 4- to 5-hour sessions per day, with some additional time devoted to discussion of the results of the meeting.

It was necessary during the course of the season to audition, hire, and rehearse musicians and supporting casts. The corporation employed a body of musicians to provide orchestral accompaniment to Liberace. Supporting acts, generally consisting of trained singers or musicians, were included in the program in order to provide the audience with some diversion from Liberace's performance as well as to give him an opportunity to change costumes. Although the musicians engaged by International Artists were generally experienced, rehearsals were nevertheless necessary because the musicians were required, in performing for the Liberace show, to commit all musical numbers performed on the show to memory. Rehearsals were also necessary in the case of experienced supporting casts in order to integrate their acts with the balance of the performance. The numerous rehearsals thereby required were all held at Harold Way. Petitioner, whose reputation as a piano virtuoso depended upon continuous and intensive practice, similarly used Harold Way for purposes of practice and rehearsal. Auditions held at Harold Way were normally attended by Liberace, Robinson, Seymour Heller, and Ray Arnett.

The key employees of International Artists and the positions they occupied during the period in question are as follows:

| Employee | Position |
| --- | --- |
| Walter V. Liberace | president, musician |
| Gordon Robinson | musical director, conductor |
| Ray Arnett | stage manager, choreographer |
| Seymour Heller | personal manager of Liberace, public relations |
| Mrs. Luckie | catering manager |
| Robert Fisher | wardrobe manager |

In addition, the corporation employed a number of secretaries.

Harold Way, in addition to its use as a facility for the preparation and rehearsal of the musical programs, served other important business needs. Activities in connection with the wardrobe, of major importance in the Liberace show, were conducted at Harold Way. The corporation employed two individuals to supervise the designing and maintenance of Liberace's elaborate wardrobe. Frank Acuna was primarily responsible for designing and tailoring of clothing, while Robert Fisher, a full-time employee, acted as Liberace's valet. Although Frank Acuna had a place of business of his own, he found

it necessary for secrecy reasons to conduct all activities with respect to the wardrobe at Harold Way. This involved selection of fabrics, designing of costumes, and tailoring. Additional personnel were engaged to assist in embroidery work and the cleaning of costumes. The garments were hand-cleaned on the Harold Way premises. A specially designed closet held the numerous costumes used by Liberace and other entertainers on the show. Musical and stage equipment, including seven pianos, a number of violins, an organ, and candelabras used in the performances were stored at Harold Way.

Stage designing and choreography were also conducted at Harold Way. These matters were generally tended to after completion of the preliminary work, described above, with respect to musical programing. During the taxable period in question, International Artists produced six record albums. All preparatory work in connection with stage designing, choreography, and recordings took place at Harold Way.

The corporation's product, the Liberace show, was marketed primarily through the efforts of Seymour Heller, Liberace's personal manager. Heller's services to the corporation included, in addition, the coordination of job offers, negotiation of contracts, arrangement of details of travel and accommodations, and public relations. All contracts, and major decisions, were subject to the approval of petitioner as president of the corporation. Conferences between petitioner and Heller with respect to business matters were frequently held at Harold Way, usually in the second-floor dining room.

Apart from the business use of Harold Way in the production of concerts described above, Harold Way served, to some extent, a publicity and advertising function to the corporation. The home was extensively photographed. Brochures customarily distributed at Liberace performances emphasized by photograph and reference the "palatial home" of Liberace. The appearance of the home was commonly imitated on stage, including in one instance the reproduction of the circular staircase found at Harold Way. Magazine and newspaper photographers were invited and encouraged to visit the premises for publicity purposes. Press parties attended by members of the press and celebrities, calculated to generate publicity for Liberace, were sometimes, though not frequently, held at Harold Way.

As a result of the promotional efforts of International Artists, various news media often carried articles or references about Liberace. His unusual home was invariably mentioned in these articles, with description and photographs of the home figuring prominently in some instances. Petitioner is referred to in his brochure and by the press as "Mr. Showmanship." In order to maintain the continued

public interest in Harold Way, the home was partially restyled every 2 or 3 years.

Prior to 1959 petitioner owned a home in Sherman Oaks. The home had been built by endorsements, i.e., through contributions of various companies for advertising purposes of their own. Because it had been built in this manner, the home, which contained among other things a piano-shaped swimming pool, became a tourist attraction and was visited extensively by the public. The Sherman Oaks home and its furnishings were the private property of Liberace. The lack of privacy at this residence influenced petitioner's decision to dispose of it in 1959. Following the disposition and prior to acquisition of Harold Way, the apartment in which petitioner resided in Los Angeles was used for general business purposes such as rehearsals, auditions, and business conferences. The apartment, because of disturbances caused to neighboring residents, was ill-suited for the business use to which it was put.

Harold Way constituted during the taxable years in question the sole business premises of International Artists. The only business purpose served by facilities other than Harold Way consisted of the maintenance of books and records at the office of Jacobs.

The extensive business use of Harold Way, described above, was for the most part restricted to specific areas of the premises. Rehearsals and auditions were primarily held on the first floor of the house. The particular rooms so utilized were the studio and living room, each containing two pianos and other necessary equipment. The former was soundproof and was heavily used as a work area. The latter, containing an alcove used as a stage, was similarly used for rehearsals. The projection room, on the first floor, was used exclusively for business purposes. The first floor was thus devoted primarily to business purposes and was used little, if at all, for the personal accommodation of Liberace. The wardrobe closet on the third floor was similarly used exclusively for business purposes.

Several areas of the home on the upper levels, while used sometimes for business purposes, were less frequently utilized in this manner. In this category are the living and dining rooms of the second floor. The living room, including a "stage" area and organ room, was used, although less frequently than the first-floor areas, for purposes of rehearsals. Rehearsals were normally held in this room when the production had reached a relatively complete stage. Business conferences were generally held in the dining room. In addition, activities in connection with petitioner's wardrobe were conducted in the dining room or bedroom. The kitchen and dining room facilities on the first and second floors, adjacent to the workrooms, were used occasionally for coffee breaks and discussions following work sessions.

In 1960, shortly after the purchase of Harold Way, International Artists entered into a lease with petitioner, effective December 1, 1960, under which a portion of the premises on the third floor, consisting of a bedroom, sitting room, bathroom, and closet, was leased to Liberace for a term of 1 year at an annual rental of $3,600. The lease provided in part:

SECOND: Lessor [International Artists] represents that it uses substantially all of the subject improved real property for the purpose of rehearsing, planning and staging programs suitable for presentation throughout the world, and for holding business conferences, entertainment and for otherwise conducting the business of Lessor, and the rights of Lessee hereunder are subject to the rights of corporation to use the premises in promoting its business purposes.

THIRD: Lessor does hereby lease to Lessee [Liberace] a portion of said improved real property consisting of an area on the third floor, including a bedroom, sitting room, bathroom and closet area, more fully described in the floor plan attached hereto, marked Exhibit "A" and by this reference made a part hereof, said space being leased hereunder being shown in the shaded area of Exhibit "A".

FOURTH: The initial term of this Agreement shall be for a period of one (1) year from the date hereof and for which Lessee agrees to pay to Lessor as total consideration the sum of $3600.00, payable $300.00 on the first of each month commencing December 1, 1960, and continuing on the first day of each month for the said term of one (1) year.

Lessee shall have the option of renewing this Lease upon the same terms and conditions and covering two (2) successive years. If Lessee does not give thirty (30) days or more advance notice of his election to terminate the Lease at the end of any year, then this Lease shall be deemed automatically renewed for another year.

FIFTH: The leased premises shall be fully furnished as at present and Lessee acknowledges that he has inspected the premises and accepts them in their present condition. Lessor agrees to provide maid service for Lessee, including the laundering and supplying of bed linen and towels. Lessor further agrees to pay for all utilities and taxes chargeable against the property, including that portion occupied by Lessee, and does hereby hold Lessee harmless on account of said taxes and utilities.

The rental payments from petitioner to the corporation during the taxable years in question amounted to $3,600 per year.

Petitioner's personal use of Harold Way was not limited to the portion covered by the lease. While the business use of Harold Way was substantial, it was designed to and did serve during the period in question as the petitioner's principal place of residence. All parts of the home were accessible to Liberace without restriction, subject only to the overriding business use of the houses. The areas, particularly on the upper levels of the home, which were subject to occasional business use were also freely utilized by petitioner for personal purposes. Nonbusiness guests of petitioner, including family and friends, were entertained at Harold Way without restriction to

the leased premises. Petitioner, who collected pianos as a hobby, spread the collection, consisting primarily of miniature pianos, over the entire home. Petitioner's many automobiles were garaged at Harold Way. The gymnasium located in the garage was devoted solely to nonbusiness use. The swimming pool, cabana, and formally landscaped grounds in back of Harold Way provided petitioner with magnificent entertainment facilities. The entire home was represented to the public as the residence of Liberace, and the personal pleasure associated with such possession resided with petitioner. In short, Harold Way was purchased for the dual purpose of satisfying the business needs of the corporate petitioner while providing a home to Liberace, consistent with his life style and reputation.

Petitioner also maintained a home in Palm Springs in which he resided for approximately 15 days per year during the period in question. Petitioner resided at Harold Way whenever present in Los Angeles, whether working or not. Weekends during nonworking periods were usually spent at his home in Palm Springs.

During the taxable years in question petitioner resided in Los Angeles for approximately 95 to 130 days per year. A substantial majority of these days were devoted, in part, to preparatory work in connection with concerts produced by International Artists.

The corporation paid real property taxes and interest attributable to Harold Way in the following amounts:

| Fiscal year | Real property taxes | Interest |
|---|---|---|
| 1963 | $3, 416. 81 | $3, 869. 10 |
| 1964 | 3, 547. 87 | 9, 998. 37 |
| 1965 | 3, 506. 62 | 6, 820. 50 |

For the years 1962, 1963, and 1964 respondent determined deficiencies in petitioner's income taxes as set forth above on the ground that the fair rental value of the Harold Way premises constituted dividend income to him. For the fiscal years ending May 31, 1963, 1964, and 1965, International Artists claimed deductions in the sums of $42,919.43, $59,307.71, and $51,614.23 with respect to the depreciation and maintenance of Harold Way. Respondent has allowed the claimed deductions in the amounts of $6,900, $6,300, and $6,000, respectively, disallowing the balance on the grounds that it did not constitute an ordinary and necessary business expense of the business.

OPINION

The issues in this case are whether the corporation is entitled to deductions for depreciation and maintenance expenses with respect to the Harold Way premises; and whether petitioner, the president and controlling shareholder of the corporation, is chargeable with

income as a result of his personal use of the home. This oft-litigated question has arisen in a variety of factual contexts, including the use by a shareholder of automobiles, yachts, realty, and other facilities of a corporation. Resolution of this issue depends upon the facts and circumstances of each case.

The applicable statutory provisions with respect to the deductibility of the contested items by the corporation are sections 162 and 167,[2] the former providing a deduction for "ordinary and necessary" business expenses and the latter a depreciation deduction with respect to "property used in the trade or business." The initial question to be considered, in either case, is whether the ownership and maintenance of the realty related primarily to personal or to business purposes. In general, where the acquisition and maintenance of property such as an automobile or residence is primarily associated with profit-motivated purposes, and personal use can be said to be distinctly secondary and incidental, a deduction for maintenance expenses and depreciation will be permitted. *Delores Bussabarger*, 52 T.C 819 (1969); *United Aniline Co.* v. *Commissioner*, 316 F.2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court; *Sanitary Farms Dairy, Inc.*, 25 T.C. 463 (1955); *Simons Brick Co.*, 14 B.T.A. 878 (1928), affd. 45 F.2d 57 (C.A. 9, 1930), certiorari denied 283 U.S. 834 (1931). Cf. sec. 274(a)(1)(B) and sec. 1.274-2(e)(4), Income Tax Regs. Conversely, if the acquisition and maintenance is primarily motivated by personal considerations, the deductions must be disallowed. *Challenge Manufacturing Co.*, 37 T.C. 650 (1962); *W. D. Gale, Inc.* v. *Commissioner*, 297 F.2d 270 (C.A. 6, 1961), affirming a Memorandum Opinion of this Court. Such expenditures are not deemed ordinary and necessary and therefore fail to qualify as a deduction under section 162. See *Henry C. Smith*, 40 B.T.A. 1038 (1939), affirmed per curiam 113 F.2d 114 (C.A. 2, 1940). Moreover, the disallowance of predominately personal expenditures is expressly mandated by section 262.[3]

The above principles are applicable to corporate, as well as individual, taxpayers. In the former case, since the corporation cannot itself make personal use of the property, the character of an expenditure is determined by reference to the benefit conferred upon shareholders, officers, or other individuals in control of corporate affairs. *International Trading Co.* v. *Commissioner*, 275 F.2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court. As in the case of individual taxpayers, the personal use by a shareholder of

---

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[3] SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES.

Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.

corporate property renders expenditures with respect thereto personal and results in taxable income to the shareholder.

As indicated above, the primary purpose criterion, governing the deductibility of expenditures related to both business and personal purposes, is applicable only with respect to cases in which the secondary purpose is merely incidental and relatively insignificant. Where substantial business and personal motives exist, however, allocation becomes necessary. *William L. Heuer, Jr.* v. *Commissioner*, 283 F.2d 865 (C.A. 5, 1960), affirming per curiam 32 T.C. 947 (1959); *Clarence J. Sapp*, 36 T.C. 852 (1961), affirmed per curiam 309 F.2d 143 (C.A. 5, 1962); *Hal E. Roach Studios*, 20 B.T.A. 917 (1930). Such allocation depends, in general, upon a comparison of the personal and business considerations. In some instances, the clearly divisible nature of the shared personal and business use of property permits a rather exact allocation. See Rev. Rul. 62–180, 1962–2 C.B. 52. The deduction for allocable business use, in these cases, is computed by reference to the ratio of time or space devoted to business as compared with total use. In other cases, although less susceptible to precise measurement, allocation is equally appropriate and is made on the basis of an evaluation of the total circumstances.

Respondent concedes that the premises in question were used to some degree for business purposes and, based upon the percentages of floor-space and time the premises were used during the taxable years for business purposes, has allocated less than one-sixth of the expenses and depreciation to business use. Petitioners have taken the position that the costs of maintaining Harold Way, including depreciation, are fully deductible to the corporation. Petitioners argue that the premises were primarily used in connection with the trade or business of the corporation. To the extent the home was used by Liberace personally, it is further argued, the corporation was fully reimbursed in the form of the rental payments due under the lease. We are convinced, after a careful study of the record, that neither respondent's nor petitioners' view can prevail. While we agree with respondent that allocation is necessary in this case as a result of the substantial business and personal use of Harold Way, we find respondent's method of allocation unrealistic in the present circumstances.

We have set forth the facts of this case in considerable detail in our findings. The corporate petitioner herein was organized for the purpose of producing concerts featuring Liberace, a prominent entertainer. For the combined purposes of providing business facilities for the production of these concerts, as well as otherwise furthering a broad range of business objectives, and, in addition, of providing a suitable home for Liberace consistent with his public image, the Harold

Way property was purchased in 1960. The total cost of the home, including improvements, totaled approximately $345,000. At the same time a lease was executed between petitioner and the corporation, covering a small portion of the premises located on the third floor of the three-story structure. Rentals were provided under the lease in the sum of $300 per month.

Petitioners argue that Liberace's use of the business premises was fully compensated. This contention is unsupported by the record before us. Liberace and his controlled corporation cannot, by executing a lease with respect to a portion of the premises, preclude the proper determination of the fair rental value. There exists in the record testimony that the figure of $300 per month was based upon the independent appraisal of a real estate expert. This expert did not appear as a witness at trial. In the absence of his testimony as to the method of valuation used we can accord little, if any, weight to petitioners' claim. More importantly, however, the record is replete with testimony, including that of petitioner, that petitioner's use of Harold Way was not limited to the leased premises on the third floor. It is to be noted, among other things, that this area was physically united with the balance of the home; there existed no separate entrance or a partition separating the two. The entire home remained at all times accessible to petitioner. No restrictions were placed upon petitioner's use of the house except that contained in the lease which subjected petitioner's personal use of the entire premises to the overriding business needs. Petitioner, in fact, regarded the entire home as his own. His invited guests were not restricted to the leased premises. Nor did petitioner heed boundaries in the storage of personal effects on the property or in the personal use of all available facilities.

The lease, upon which petitioner heavily relies, was strictly a paper affair. Petitioner fully enjoyed the facilities of Harold Way, including the many elaborately furnished rooms, a private gymnasium, multiple-car garage, and swimming pool situated in the formally landscaped setting of Harold Way's grounds. The alleged valuation of the expert at best establishes the value of the suite of rooms covered by the lease; it must therefore be rejected.

Respondent's allocation in this case is equally unsound. The basis of his allocation is respondent's factual premise that one-sixth of Harold Way was devoted, for 20 percent of the time, to business purposes during the period in question. The fraction employed by respondent includes only the studio, dining room, and living rooms on the first floor, and the wardrobe closet on the third floor. The three areas on the first floor listed above, referred to by respondent as the "basic" rooms, however, clearly dominated, in utility and size, the entire first floor; the balance consisting of storage areas, a projection

room, restrooms, and foyers. The projection room was clearly used exclusively for business purposes. The other areas surrounding the basic rooms on the first floor were strictly subservient to the basic rooms and must, therefore, be characterized by reference to such rooms. Thus, we have concluded that the entire floor was devoted to business use. The costume area on the third floor and a small bedroom used as an office were similarly used exclusively for business purposes. In addition, respondent's allocation ignores the business use of areas on the second floor which, though not as heavily utilized as the first floor, served both business and personal functions. The living room was sometimes used for final or near final rehearsals. The dining room served to a substantial degree as a conference room and was involved in the preparation and maintenance of the wardrobe.

Finally, respondent's reduction of the allocable percentage of business used as a result of the nonuse of the home for business purposes during the long periods of travel away from Los Angeles was improper. During these travel periods Harold Way stood idle and was used for neither business nor personal purposes. Respondent computed the above-mentioned 20 percent figure by comparing the days of business use of the premises with the total number of days available for both business and personal use. Instead, the relevant period in determining the comparative business and personal use of Harold Way is the period of actual use of the premises during which Liberace and the other employees were present in Los Angeles. Cf. see 1.274-2(e)(4), Income Tax Regs. The record shows that the major portion of the latter period was devoted to business use of the specified areas of the home.

On the basis of the entire record we conclude that the dual use of Harold Way for business and nonbusiness related purposes requires an equal allocation of the expenses and depreciation incurred in connection with Harold Way. Thus, 50 percent of the expenses and depreciation are deductible, the balance representing nondeductible personal expenditures.[4] Similarly, the individual petitioner is in receipt of dividend income to the extent of 50 percent of the fair rental value.

The purchase of Harold Way in 1960 was clearly undertaken, to a significant degree, for business reasons. Prior to that time petitioner was forced to make his apartment available for the extensive business activities involved in the production of musical concerts. As petitioner testified, however, such facilities were inadequate for these purposes. Furthermore, it was felt that the purchase of Harold Way would have a beneficial publicity effect on International Artists. Certain improvements made to the home, such as the soundproof room, projection

---

[4] We note that the taxes and interest expenses related to the corporate ownership of Harold Way are deductible in full by the corporation. These items are deductible under secs. 163 and 164 regardless of the purpose of acquisition or use of the property.

room, wardrobe closet, and theatrical lighting equipment, following acquisition of Harold Way were designed to accommodate specific business needs. The house, in fact, generated some publicity in the form of newspaper and magazine articles describing the home. It may have, indeed, contributed to the marked increase in gross earnings of the corporation between 1960 and 1966. In addition, the presence of Liberace at Harold Way served the convenience of the corporation by affording greater flexibility in arranging rehearsals, auditions, and practice sessions. Thus, the record demonstrates extensive business use of the premises in question. In these circumstances we cannot conclude, as does respondent, that Harold Way was predominately the home of Liberace.

It is equally clear from the record that personal gratification of Liberace constituted a significant factor in the acquisition and maintenance of Harold Way. Although long periods of time were spent away from Los Angeles while on the theatrical circuit, the home remained at all times available for his personal enjoyment. Petitioner's extensive personal use of the home has been more fully described above.

Allocations of the kind required here are necessarily imprecise since they involve such factors as the purposes of acquisition, the extent of satisfaction of personal and business needs, and the increase of expenses attributable to personal consideration. We think that a 50-percent allocation properly reflects the business and personal use of the premises in question. In so concluding we are mindful of the heavy burden of proof borne by the taxpayer because of the potential abuse which exists in these cases. *Louis Greenspon*, 23 T.C. 138 (1954), modified 229 F.2d 947 (C.A. 8, 1956); compare generally sec. 274(a) and regulations thereunder. Careful scrutiny is particularly called for in the case of closely held corporations. The above allocation is amply supported by evidence in the record.

As to the dividend income to petitioner resulting from his use of the premises, it is clear that this is measured by the fair rental value of his use rather than by the cost of acquisition, since title to the realty remained at all times in the corporation. We have found that petitioner enjoyed the full use of the premises, subject only to business use of the corporation. The home was elaborately furnished and fully maintained, including the payment of utilities, cleaning, and linen expenses by the corporation. The fair rental value of the home, as such, is uncontested by petitioner. Petitioner's arguments, instead, related to the extent of personal use by petitioner and to the allocation question. Accordingly, the adjustments made to Liberace's income for the taxable years in question attributable to his use of Harold Way are upheld to the extent of 50 percent.

*Decisions will be entered under Rule 50.*