DANIEL B. KENERLY AND ANN M. KENERLY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kenerly v. Commissioner
Docket No. 11146-78
United States Tax Court
T.C. Memo 1984-117; 1984 Tax Ct. Memo LEXIS 559; 47 T.C.M. (CCH) 1244; T.C.M. (RIA) 84117; March 8, 1984. *559 Held: (1) Petitioners have failed to prove that expenses of their residence, designed to look like a Moorish castle, are deductible as advertising or promotional expenses of petitioner-husband's real estate business. (2) Petitioners underreported the gross receipts of the real estate business in the amount determined by respondent. (3) Petitioners are liable for an addition to tax under sec. 6651(a)(1), I.R.C. 1954. *560 Arthur P. Tranakos, for the petitioners. Kimley R. Johnson, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax and an addition to tax under section 6651(a)(1)[1] (failure to file timely return) against petitioners for 1974 in the amounts of $7,724.87 [2] and $1,158.73, respectively. After concessions by both sides, the issues for decision [3] are as follows: (1) Whether, and to what extent, petitioners are entitled to deductions for various expenses and depreciation relating to their home under sections 162 and 167; (2) Whether, and to what extent, petitioners understated the gross receipts from petitioner-husband's real estate business; and *561 (3) Whether petitioners are liable for an addition to tax under section 6651(a)(1). *562 FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition in the instant case was filed, petitioners Daniel B. Kenerly (hereinafter sometimes referred to as "Kenerly") and Ann M. Kenerly, husband and wife during the year in issue, resided in Lawrenceville, Georgia. Kenerly and his family have lived in the same general geographic area for approximately 45 years, and the family name is well known in the area. Before 1971, petitioners lived in an unusual western style home, built about 1967, [4] in Gwinnett County, Georgia, northeast of Atlanta. In front of the home, there was a wagon wheel embedded in brick. This home was destroyed by fire. On the same site, Kenerly had a home built in the style of a Moorish castle (hereinafter sometimes referred to as "the castle"). The castle was completed in 1971. The castle was the home of petitioners and their children from 1971 through the year in issue. *563 The castle is located on approximately ten acres of land which also contains a 1,500-yard runway airstrip. The castle contains thirty rooms; on the ground floor is a hangar for Kenerly's airplane. The hangar was used to house a Cherokee Arrow airplane. The front wall of the castle, where the main entrance is located, includes three brick turrets, ranging from about 30 to 60 feel tall. The center turret contains a living room. The left turret contains residential living areas, which have been used by petitioners as a baby nursery. The right turret contains an office used by Kenerly in his business. The castle cost about $150,000 to build. The rear of the house includes a living room, dining room, five bedrooms, four and one-half bathrooms, a garage, and several "secret rooms". Petitioners also built a bridge and a wall in front of the castle in the same motif as the castle. Petitioners built a security fence around the whole property. Petitioners were required by Gwinnett County to build a portion of this fence, between the airstrip and a road, as a condition for approval of the airstrip. Petitioners have various items on display in the castle with a medieval motif, such *564 as armor, coats of arms, and shields.
Kenerly operated a real estate company, known as Kenerly Realty Company (hereinafter sometimes referred to as "Realty"), as a sole proprietorship from 1967 until well past the year in issue. In this business, Kenerly dealt primarily in listings of farms and undeveloped land. Realty's office was in Tucker, Georgia, about five miles from the castle. Realty's gross receipts, as reported on petitioners' Federal income tax returns for 1967 through 1975, are shown in table 1. Table 1 Year
Gross Receipts
1967
$37,574.84
1968
44,003.28
1969
49,765.74
1970
54,209.72
1971
245,619.29
1972
261,283.66
1973
348,782.03
1974
133,694.79
1975
77,799.28
There is an oil painting of the castle in Realty's office. Realty's stationery, Christmas cards, and business cards show a drawing of the castle. The drawing is not identified by any language on the stationery or cards. The castle was the subject of at least three newspaper articles, and an article in the Tucker Eagle (a publication of a savings and loan association located ion Tucker, Georgia). Kenerly and Realty's agents showed the castle to many of Realty's clients, *565 sometimes merely driving by and sometimes taking them inside. Petitioners allowed the public to view and tour the castle. Numerous individuals and groups have done so. Kenerly and Realty have never undertaken any advertising campaigns based on the castle. The Cherokee Arrow airplane housed in the hangar in the castle was used by Kenerly in the business of Realty. On the Schedule C to petitioners' 1974 Federal income tax return, relating to Realty, petitioners claimed deductions in the amounts set forth in table 2, all of which relate to the castle. Table 2 Repair work on bridge
$ 509.14
Depreciation
* 9,296.39
Insurance
1,103.14
Upkeep
1,029.65
$11,938.32
The amount stipulated to have been deducted on petitioners' *566 tax return is, instead, the amount disallowed by respondent. Respondent allowed deductions of $350.08 for depreciation, $409.36 for insurance, and $451.43 for utility expenses for Kenerly's use of an office in the castle and the airplane hangar for business purposes, and disallowed the balance of the amounts shown in table 2. Kenerly reported Realty's income on the cash receipts and disbursements method. He maintained a ledger (hereinafter sometimes referred to as "the ledger") listing the amount and the payor of commissions received from each sale during 1974. The ledger shows interest income from a bank of $692.20, [5] and commissions earned of $46,334.80 for 1974. Kenerly also maintained a schedule (hereinafter sometimes referred to as "the schedule") of commissions paid to Realty's agents and to brokers. The schedule shows total commissions paid of $102,246.34 for 1974. [6] Kenerly received $12,557.04 interest from Madison, Ltd. during 1974. *567 Realty maintained two bank accounts during 1974, an escrow account and a regular account. Kenerly also maintained a personal bank account during 1974. Kenerly made the deposits shown in table 3 during 1974. Table 3 Account
Date
Amount
Description
Regular
April 24, 1974
$500.00
Transfer from Escrow
Regular
February 7, 1974
2,000.00
Cashier's Check
Regular
February 20, 1974
404.64
Unknown
Regular
February 26, 1974
819.81
Cashier's Check
Regular
March 4, 1974
250.04
Cash
Personal
June 28, 1974
3,000.00
Transfer from Escrow
On the Schedule C to petitioners' tax return, petitioners showed $133,694.79 gross receipts and $12,557.04 interest income. In the notice of deficiency, respondent determined that petitioners had understated Realty's gross receipts by $22,474.49. [7]
Petitioners' tax return for 1974 was mailed on July 15, 1975, and was filed on July 16, 1975. Petitioners' counsel mailed to respondent a request for an automatic two-month extension of time (until June 15, 1975) for petitioners *568 to file their tax return. This request, although dated April 15, 1975, was not received by respondent until May 7, 1975. The tax return filed by petitioners did not include any document or statement showing that an extension of time for filing had been requested or granted. * * * Petitioners understated the gross receipts of Realty on their tax return by at least $6,974.49. Petitioners' application for extension of time to file their tax return for 1974 was not filed until after April 15, 1975. OPINION As a preliminary matter, we consider petitioners' contention that a newspaper article concerning petitioners and the castle, which was introduced into evidence by petitioners, cannot be relied on by respondent for the truth of any statements contained therein. Petitioners contend that the article was introduced into evidence for the limited purpose of establishing the fact of media publicity of the castle. Petitioners did not indicate at or before the trial that they were introducing the article for a limited purpose, and they first raised the issue on brief. Petitioners have waived any objections on this matter by their failure to make a timely request that the article *569 be admitted for a limited purpose only. See Rules 103 and 105, Fed. R. Evid.; Staniewicz v. Beecham, Inc.,687 F.2d 526, 531 (CA1 1982); Fuller v. Commissioner,213 F.2d 102, 104 (CA10 1954), affg. 20 T.C. 308, 314 (1953); Harris v. Commissioner,46 T.C. 672, 674 (1966); see United States v. Mennuti,679 F.2d 1032, 1036 (CA2 1982). Further, on brief petitioners have themselves relied on this very article in a manner inconsistent with their claimed limited purpose. We conclude that the use of the article as evidence should not be restricted to a limited purpose. I. CASTLE EXPENSES
Petitioners assert that they incurred the expenses shown in table 2, supra (apparently about two-thirds of the total expenditures and depreciation for the castle), for the purpose of advertising and promoting the business of Realty. They maintain that they are therefore entitled to deduct these amounts as trade or business expenses. Respondent contends that petitioners are not entitled to deductions for amounts in excess of those allowed in the notice of deficiency because *570 (1) the expenses are personal living expenses, nondeductible under section 262, (2) the expenses are not ordinary and necessary business expenses under section 162, and (3) petitioners have failed to establish any direct relationship between the expenses and the business of Realty. We agree in general with respondent. Deductions are allowable under section 162 [8] for the taxpayer's ordinary and necessary expenses in carrying on a trade or business. Depreciation deductions are allowable under section 167 [9] for property used in a trade or business. However, under section 262, [10] personal expenses generally are not deductible. Sharon v. Commissioner,66 T.C. 515, 522-525 (1976), affd. 591 F.2d 1273, 1275 (CA9 1978).
*571 Whether an expenditure is directly related to a trade or business and whether it is ordinary and necessary generally are questions of fact, Commissioner v. Heininger,320 U.S. 467, 475 (1943), and the burden of proof is on the taxpayers. Chapman v. Commissioner,48 T.C. 358, 366 (1967). Petitioners must show that the ownership and maintenance of the castle relate primarily to business rather than social or personal purposes. International Artists, Ltd. v. Commissioner,55 T.C. 94, 104 (1970); Chapman v. Commissioner,48 T.C. at 366. Where there is a mixture of personal or family considerations and business considerations for an expenditure, especial care is required in determining which considerations predominate, and whether any part of the expenditure may qualify for deduction under the dichotomy of sections 162 and 167 and section 262. Henry v. Commissioner,36 T.C. 879, 884 (1961); See Sharon v. Commissioner,66 T.C. at 524. In general, where the acquisition and maintenance of property such as an automobile or residence is primarily associated with profit-motivated purposes, *572 and personal use can be said to be distinctly secondary and incidental, a deduction for maintenance expenses and depreciation will be permitted. Conversely, if the acquisition and maintenance is primarily motivated by personal considerations, the deductions must be disallowed. International Artists, Ltd. v. Commissioner,55 T.C. at 104. Greenspon v. Commissioner,23 T.C. 138 (1954), affd. on this issue 229 F.2d 947 (CA8 1956), involved an individual who bought about 10 acres of land in the suburbs of St. Louis. Greenspon's "plan in acquiring the property was to develop it into a farm and horticultural showplace, and to use its produce and facilities to develop goodwill to promote the sale of industrial pipe sold by" his corporation. The farm was Greenspon's home. 23 T.C. at 142. Of the amounts there in dispute, Greenspon paid about three-quarters and his corporation paid about one-quarter. We described the situation as follows (23 T.C. at 151): We think that it is too remote and too extraordinary to classify expenditures for farm tools, fertilizers, shrubbery, etc. as promotional expenses or as entertainment *573 expenses. Nor are we able to accept the contention that these expenses are justified because the farm was developed as a sort of horticultural showplace to impress potential customers. The relationship between the aesthetic stimulation of a potential customer from the view of an unusual array of shrubbery and flowers and his order for pipe is much too oblique. The Court of Appeals agreed with our analysis, as follows (229 F.2d at 955): When the law above set out is applied to the facts in the cases before us, we are satisfied that the Tax Court's finding that the farm expenses paid by the corporations were not ordinary and necessary business expenses is backed by adequate evidentiary support. Louis Greenspon has made no showing that the creation of a horticultural show place by a corporation at the home of its principal officer and stockholder is such an expense as is ordinarily incurred in promoting a corporate business. We find no cases authorizing the deduction of promotional expense which resulted in enhancing the value of the taxpayer's home. An allowance of this type would open the door to many questionable deductions. In Henry v. Commissioner,supra, *574 Henry sought to deduct the expenses of his boat, which, he contended, was bought and operated as a promotional scheme. He "conceived of and adopted a house flag colored, red, white, and blue and bearing the numerals '1040.' The flag provoked inquiries, and petitioners and their son would reply to such inquiries by stating that petitioner was a CPA and a lawyer practicing as a tax specialist and that the numerals '1040' represented the form number of a Federal individual income tax return. Further opportunities to discuss business acrose from these replies. Often these discussions concerned taxes." 36 T.C. at 880. Henry "summarized his position succinctly: 'I contend that I operated the boat in question as a promotion on the hope that rich clients might result--much the same as if I had purchased a full page advertisement in a class magazine announcing that I was for hire.'" 36 T.C. at 882. We concluded that Henry had failed to prove that the flag made his yacht expenditures "necessary" to his trades or businesses as a lawyer or an accountant. He failed to "show exactly how, and under what circumstances, [his] boating activities produced a single fee. *575 " 36 T.C. at 885. Also, Henry failed to prove that it was ordionary for people in his professions to incur such expenses. In the instant case, the castle was the residence of petitioners and their children. Petitioners lived in an unusual home before Kenerly had the castle built. The castle drew some publicity, but substantially all of it focused on the castle and petitioners, and very little referred to Kenerly's business. Kenerly's business improved substantially in 1971, but petitioners have failed to show a causal relation between that improvement and any advertising or promotional effect of the castle. As in Greenspon and Henry, we conclude that petitioners have failed to carry their burden of proving that their expenses for and depreciation of their residence were primarily advertising or promotional expenses for Kenerly's business. Also, petitioners have failed to prove that the incurring of such expenses are ordinary in Kenerly's business. See Welch v. Helvering,290 U.S. 111, 114-115 (1933). Deputy v. du Pont,308 U.S. 488, 495 (1940). In short, we conclude that petitioners' castle was their home. We hold *576 for respondent on this issue. II.GROSS RECEIPTS
Respondent contends that petitioners underreported Realty's gross receipts during 1974 in the amount of $6,974.49, which is taxable under section 61(a). [11] Petitioners contend that they did not have any unreported taxable income during 1974. On their tax return, petitioners reported on Schedule C gross receipts and interest income for Realty in the amounts of $133,694.79 and $12,557.04, respectively.The interest was paid by Madison, Ltd. At trial, Kenerly testified that Realty's gross receipts during 1974 equaled the amount of the commission income shown on the ledger plus the total commissions he paid to his agents and brokers as shown on the schedule. He testified that the ledger and the schedule were records that he had *577 prepared personally. The ledger shows total commission income of $46,334.80. The schedule shows total commission payments of $102,246.34. The sum of these amounts is $148,581.14, which is $14,886.35 more than the amount shown on petitioners' tax return as gross receipts. Kenerly's own testimony and accounting records establish that Realty's actual gross receipts exceeded the amount reported on petitioners' return by at least the amount asserted by respondent. On brief, petitioners argue that the payment from Madison, Ltd. was included in the commissions shown on the ledger. However, petitioners presented no testimony on this point, and only one entry in the ledger, an August 20 entry for $1,361.76 on "Madison Note", is consistent with this contention. The sum of the ledger commissions total and the schedule total is $148,581.14. Even if we were to reduce this sum by the amounts of the August 20 Madison Note entry on the ledger and the $981.49 Sherrod entry on the schedule (see n.6, supra), the gross receipts figure to which Kenerly leads us would be $146,237.89. This amount exceeds the $133,694.79 petitioners reported on their return, and does so by more than the $6,974.49 *578 additional gross receipts determined by respondent. Since we have concluded that petitioners underreported Realty's gross receipts based on the evidence discussed supra, we need not address petitioners' explanations of the source of the bank deposits shown in table 3. We hold for respondent on this issue. III. LATE FILING
Petitioners have the burden of proving error in respondent's determination that an addition to tax should be imposed under section 6651(a)(1). [12]Ehrlich v. Commissioner,31 T.C. 536, 540 (1958). *579 Petitioners do not claim that their failure to file a timely return was due to reasonable cause. Petitioners contend that they are liable for an addition to tax for only a one-month delinquency, while respondent asserts that there was a three-month delinquency. Petitioners' sole contention with respect to this issue is that they timely filed a Form 4868, Application for Automatic Extension of Time to File, requesting a two-month extension of time for filing their 1974 income tax return. Respondent acknowledges that such a form was filed, but contends that it was not filed timely and, therefore, was not effective. See section 1.6081-1(b)(1), Income Tax Regs.We are not persuaded by petitioners' evidence on this issue and we have found that the Form 4868 was not filed timely.(Petitioners do not claim the benefits of sec. 7502. The record does not include any evidence that would enable us to give petitioners any relief under this provision.) The amount of the sanction imposed by section 6651(a)(1) is based on the amount of the tax required to be shown on the return, reduced under section 6651(b)(1) by the amount of the tax paid by withholding or as estimated tax. See Reiff v. Commissioner,77 T.C. 1169, 1180 (1981). *580 In the notice of deficiency, respondent apparently failed to apply section 6651(b)(1). As part of the Rule 155 computation, petitioners' withholding and estimated tax payments for 1974 should be taken into account in computing the addition to tax. Apart from the foregoing modifications, we hold for respondent on this issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all chapter and section references are to chapters and sections of the Internal Revenue Code of 1954 as in effect for the year in issue. ↩
2. The deficiency consists of $6,682.07 in chapter 1 income tax, and $1,042.80 in chapter 2 self-employment tax. ↩
3. The medical expense adjustment in the notice of deficiency is derivative and depends on the settled issues and our resolution of the issues in dispute.↩
4. So Kenerly testified. In Kenerly v. Commissioner,T.C. Memo. 1975-139↩, the testimony showed that petitioners had moved into this western style home in September 1965.
*. The parties stipulated that petitioners deducted $8,946.31 as "Depreciation of residence" on their 1974 tax return. However, the attachment to schedule C-3 on petitioners' tax return shows the depreciation components as follows: ↩
Item
Cost
Method
Depreciation
The Castle
$100,000.00
DB
$5,935.91
Fences & Security Systems
12,700.88
DDB
1,626.11
Perimeter Wall
25,000.00
DB
1,734.37
$9,296.39
5. This $692.20 was reported on petitioners' tax return on Schedule B, Part II, Interest Income. ↩
6. The total of the schedule entries is $102,246.34. However, petitioners deducted only $101,164.85 as commissions on their return. In the notice of deficiency, respondent allowed an additional deduction of $100, for a total commission expense of $101,264.85. We note that (1) petitioners do not claim any more commission expense than respondent allowed, (2) Kenerly testified that the schedule consisted of the commissions paid to Realty's agents or brokers, and (3) the difference between the total of the schedule entries and the deduction is $981.49, which is equal to the schedule entry for "1074 SHERROD". Neither side seeks to enlighten us as to the significance of this $981.49 item.↩
7. At trial, respondent conceded $15,500 of this amount; he contends that petitioners had unreported gross receipts of $6,974.49.↩
8. Section 162 provides, in relevant part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *. ↩
9. Section 167 Provides, in relevant part, as follows: SEC. 167. DEPRECIATION. (a) General rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, * * * ↩
10. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter [i.e., chapter 1] no deduction shall be allowed for personal, living, or family expenses.↩
11. Section 61(a) provides, in relevant part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; (2) Gross income derived from business;↩
12. SEC. 6651. FAILURE TO FILE RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; [The subsequent amendment of this provision (by section 318(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 610) does not affect the instant case.]↩