Clement V. and Marjorie A. Conole v. Commissioner.
Conole v. Commissioner
Docket No. 4916-67.
United States Tax Court
T.C. Memo 1971-111; 1971 Tax Ct. Memo LEXIS 219; 30 T.C.M. (CCH) 467; T.C.M. (RIA) 71111; May 18, 1971, Filed. *219 Held: (1) The lease of property by petitioner to a corporation, 50 percent of the stock of which was owned by petitioner, was a valid lease. Held: (2) Property leased by petitioner to a corporation, 50 percent of the stock of which was owned by petitioner, was utilized for both business and the personal activities of petitioner. Allocation established: (a) With respect to each of the years in question, petitioner is chargeable with income to the extent of an allocable portion of the total cost incurred by the corporation in the operation of the property. 468 (b) With respect to 1961, petitioner is entitled to a deduction to the extent of an allocable portion of entertainment expenses. (c) With respect to each of the years in question, petitioner, as lessor of the property, properly included as rental income the sums paid to him by the corporation under the lease and properly deducted depreciation, repair, and maintenance expenses. Held: (3) Payment of the expenses of petitioner's trip to Europe by a corporation, 50 percent of the stock of which was owned by petitioner, was a payment of petitioner's personal expense, and such payment constitutes income to the petitioner *220 under sec. 61. Held: (4) A corporation, 50 percent of the stock of which was owned by the petitioner, paid petitioner an amount equal to a deficiency in petitioner's income tax for 1956. Petitioner has failed to rebut the presumptive correctness of respondent's determination that the payment was income to the petitioner in that it constituted payment of a personal expense of the petitioner. Held: (5) and (6) A corporation, 50 percent of the stock of which was owned by petitioner, was the only beneficiary of legal fees which it expended in the name of petitioner in attempting to enforce an option. This corporation was also the sole beneficiary of a stock purchase in which the corporation paid for the stock and the stock was initially issued in the name of the petitioner. Consequently, such expenditures by the corporation were not income to the petitioner. Held: (7) Without more, sale of stock to a prospective employee at a higher price than that paid by petitioner as an insider in a contemporaneous sale does not result in bargain purchase income to the petitioner. Neither transaction is determinative of value. Held: (8) With respect to each of the years in question, petitioner *221 is not entitled to deduct automobile expenses beyond that portion allowed by the respondent. Held: (9) With respect to each of the years in question, petitioner is entitled to deduct an allocable portion of home office expenses. F. Cleveland Hedrick, Jr., Fred S. Gilbert, Jr., and Carl A. Nordberg, Jr., for the petitioners. James A. McNabb, Jr., and John J. O'Toole, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the Federal income tax due from petitioners as follows: Year
Deficiency
1958
$ 2,270.09
1959
32,489.80
1960
22,170.04
1961
18,153.58
*222 Respondent concedes that petitioners' income for the taxable year 1958 should not include a $3,800 consulting fee received by American Business Management Co. and credited to the account of petitioner C.V. Conole. Respondent also concedes that petitioners' income for the taxable year 1961 should not include legal fees of $3,643.84 paid by Whiting Paper Co. to Mr. Gordon Phillips. Respondent further concedes that a payment to William Whiting by Whiting Paper Co. on June 30, 1959 in the amount of $5,000 for 50 percent of the stock of Whiting Paper Co. acquired by petitioner C.V. Conole was not income to him. Petitioners failed to present any evidence at trial with respect to a $20,000 bad debt deduction which they claimed on their 1960 income tax return and which was disallowed by the respondent. Consequently, this issue will be considered as having been abandoned by petitioners. The remaining issues presented for decision are: (1) Whether a facility owned by petitioners and leased to Tabulating Card Co. and later Whiting Paper Co. (50 percent of the outstanding stock of both corporations was owned by petitioner C. V. Conole) under a lease which was terminable by either party *223 on 30 days notice was used by the corporations as an executive training and meeting site, or whether it was used by petitioner C. V. Conole as a personal residence for the entertainment of friends and relatives. The resolution of this issue will determine the following subsidiary issues: (a) Whether petitioners realized income in the amount of $42,720.58 as the result of expenditures made by the above corporations to provide for capital improvements to the facility during the years 1959, 1960, and 1961. (b) Whether petitioners realized income in the amount of $17,383.70 as the result 469 of expenditures by the above corporations representing the costs of operating the facility in the years 1959, 1960, and 1961. (c) Whether petitioners are entitled to deduct expenses incurred by petitioners for repairs and other maintenance expenses in regard to the facility during the years 1959, 1960, and 1961. (d) Whether petitioners are entitled to deduct $3,039.33 for expenditures (reimbursed by Whiting Paper Co.) for food and beverages provided for consumption of the facility in 1961. (e) Whether petitioners are entitled to depreciation deductions with respect to the facility in *224 the aggregate amount of $9,979.46 for the years 1959, 1960, and 1961. (2) Whether petitioners realized income in the year 1959 in the amount of $1,869.80 as the result of an expenditure made by Tabulating Card Co. for petitioner C. V. Conole's trip to Europe. (3) Whether petitioners realized income in the year 1959 in the amount of $990.46 as the result of petitioner C. V. Conole being paid that amount by a corporation (50 percent of the stock of which was owned by him). (4) Whether petitioners realized income in the year 1958 in the amount of $505.81 as a consequence of a legal fee paid by the American Business Management Co. (50 percent of the stock of which was owned by petitioner C. V. Conole) with respect to a suit brought in the name of petitioner C. V. Conole. (5) Whether petitioners realized income in the year 1959 in the amount of $107.02 with respect to the payment by American Business Management Co. of that amount for stock of James McCutcheon & Co. acquired in the name of petitioner C. V. Conole. (6) Whether the purchase by petitioner C. V. Conole of stock in a corporation, 50 percent of the stock of which was owned by the petitioner, was a bargain purchase resulting *225 in income to petitioners in the amount of $3 per share ($375 on the purchase of 125 shares). (7) Whether petitioners are entitled to deductions claimed as ordinary and necessary business expenses by the petitioners with respect to the use of their automobile during the years 1959, 1960, and 1961. (8) Whether petitioners are entitled to deductions claimed for maintaining a home office in 1960 and 1961, and whether they are entitled to such a deduction in 1959 in excess of the amount allowed by the respondent. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Clement V. Conole and Marjorie A. Conole, the petitioners, are husband and wife. Joint Federal income tax returns for the years 1958 through 1960 were filed by petitioners [1] with the district director of internal revenue at Camden, New Jersey and for the year 1961 with the district director of internal revenue at Philadelphia, Pennsylvania. At the time the petition herein was filed, the petitioners' legal residence was in Boca Raton, Florida. *226 During the years in issue, Clement V. Conole (hereinafter referred to as "petitioner") had an interest in Tabulating Card Co. (hereinafter referred to as "TABCO") and American Business Management Co. (hereinafter referred to as "ABM"). TABCO was a licensee of IBM Corp. and was primarily engaged in the production and sale of data processing supplies, principally tabulating cards. ABM was primarily a consulting engineering firm. All the voting stock of TABCO and ABM was owned equally by petitioner and one L. S. Crandall [2] (hereinafter referred to as "Crandall"). In June 1959, petitioner and Crandall purchased, equally, all outstanding stock of Whiting Paper Co. (hereinafter referred to as "Whiting"). Shortly thereafter, Whiting assumed all the business activities of TABCO. During the years in question (1959, 1960, and 1961), petitioner was employed by TABCO, and later Whiting, as chief executive officer, officer in charge of sales and sales promotion, and he served as chairman of the board of directors. *227 Crandall was a former executive of IBM and during the years 1959, 1960, and 1961 was president of Royal Precision, Inc. During these years, he was neither an officer nor a member of the board of directors of TABCO, IBM, or Whiting. During 1959, 1960, and 1961, 470 Crandall had no managerial responsibility in connection with any of the companies which he jointly owned with petitioner. However, as owner of 50 percent of the stock of such companies, he took an active interest in the management of such companies by the petitioner. During 1958, TABCO lacked facilities for business meetings and sales promotion. From time to time, public facilities in the area of Princeton, New Jersey, were engaged for that purpose. In the meanwhile, petitioner sought a suitable facility where its executives could meet and customers or potential customers could be entertained. Ultimately, petitioner located a vacant house near Skytop, Pennsylvania, which he deemed suitable for that purpose. The house was owned by Skytop Lodges, Inc., a realty company. Due to restrictions limiting ownership of property in the Skytop development to individuals, as distinguished from corporations or business, TABCO could *228 not purchase the property. Accordingly, the petitioner purchased the facility (hereinafter sometimes variously referred to as "Skytop," "Cresco" or "Fairway House") on or about April 1, 1959, and on the same date, petitioner leased the facility to TABCO for a term of 5 years at a yearly rental of $6,000. The lease provided, in part: 6. Either party shall have the right to cancel the within lease on thirty days written notice, said notice to be delivered to the address of the other party by certified mail. During the years in question, petitioner received rental payments from TABCO or Whiting under the lease in the following amounts: Year
Amount
1959
$6,000
1960
4,500
1961
3,500
The lease was terminated by mutual agreement in November 1963, 5 months prior to the expiration of the 5-year lease period. In 1965, petitioner placed the facility up for sale, and upon its sale, petitioner retained the proceeds. The house on the Cresco property was a large stone residence with 9 bedrooms, 4 bathrooms, a large dining room, living room and reception hall. It was built and equipped to be utilized on a year-round basis and was on the main road and therefore easily *229 accessible. The cost of the Cresco property leased by petitioner to Whiting was as follows: (a) House: $30,538.00 * - acquired May 8, 1959 (date of closing) (b) Furniture: $669.03 - acquired May 8, 1959 (c) Furniture: $5,323.96 - acquired January 1, 1960 The house and the furniture leased by petitioner to Whiting had a useful life of 25 years and 10 years, respectively. During the years 1959, 1960, and 1961, Whiting made capital improvements to the Cresco property in the following amounts: Year
Amount
1959
$33,180.17
1960
3,618.20
1961
5,922.31 The improvements involved substantial remodeling and renovating of the facility. The kitchen was enlarged and modernized. Extensive rewiring of the electrical system was undertaken, and new plumbing was installed. A powder room was constructed on the first floor. The interior and exterior of the house was repainted. The bathrooms on the second floor were remodeled and two additional bathrooms were added. New furnishings and carpeting were acquired for most of the rooms. Finally, the heating system in the house was modernized *230 and additional landscaping was done. The respondent has included the cost of these expenditures in the gross income of the petitioner. In his income tax returns for 1959, 1960, and 1961, petitioner claimed depreciation on the Cresco property, utilizing the double declining balance method. Petitioner claimed and the respondent disallowed depreciation expenses as follows: Year
Amount
1959
$4,650.00
1960
2,664.73
1961
2,664.73
Repairs and other expenses in regard to the Cresco property were paid by petitioner in the following amounts for the years shown below: Year
Amount
1959
$1,899.16
(exclusive of interest in the amount of $750.00)
1960
567.90
(exclusive of interest and tax- es in the amount of $2,069.20)
1961
1,177.73
(exclusive of interest and tax- es in the amount of $1,546.84) 471 These amounts were claimed by petitioner as business expenses in each of the years as indicated and were disallowed by the respondent. During the years 1959, 1960, and 1961, Whiting made the following expenditures in connection with the operation of the Cresco facility: Nature of Expenditure
1959
Year 1960
1961
Domestic Service - Caretaker and housekeeper
$4,160.00
$4,680.00
Social Security on Domestics
124.80
140.40
Fuel, Food and Other Operating Expenses
$2,598.55
2,058.54
1,032.21
Station Wagon
2,173.20
Snow Plow
416.00
Totals $2,598.55
$6,343.34
$8,441.81
*231 The respondent has included these amounts in the gross income of the petitioner on the grounds that these expenditures by Whiting represented the payment of petitioner's personal expenses. During the year 1961, petitioner paid the amount of $3,039.33 (reimbursed by Whiting) for food and other items used in connection with the operation of the facility at Cresco. This item was claimed as a business expense deduction by petitioner on his 1961 income tax return, and the claimed deduction was disallowed by the respondent. Crandall was aware of the lease and approved of it. He was also familiar with the general framework of the entire Cresco arrangement as indicated by the fact that as chairman of the executive committee of Whiting he signed a registration statement filed with the Securities and Exchange Commission on behalf of Business Supplies Corporation of America (formerly Whiting Paper Co.) on June 29, 1962 which provides, in part: The Company has one lease with an affiliated landlord, Clement V. Conole, for sales facility in Cresco, Pennsylvania. This property has been leased by Mr. Conole and his wife to the Company for a term of five years commencing April 1, 1959, at an *232 annual rental of $6,000 per year. The management considers this facility as particularly desirable for holding meetings and interviewing customers as is done by the Comapny's major competitors. It is conveniently close to resort centers where additional space can be rented for large meetings. The management believes that it is advisable to maintain this facility. * * * The registration statement was also signed by the principal officers of Whiting and its board of directors including the petitioner as chairman of the board and chief executive officer. On May 31, 1959, the aforesaid lease was assigned by TABCO to Whiting at the time of the merger of the two companies. On May 25, 1959, TABCO paid Thomas Cook & Son $1,869.80 in payment for transportation and lodging expenses incurred by the petitioner with respect to a 29-day trip to Europe taken from June 19 through July 17, 1959. The petitioner's wife did not accompany him on the European trip, but he was accompanied by his daughter, and petitioner paid for her expenses. During the trip, petitioner met with various boards of trade and with the representatives of several business machine companies in Europe. No memoranda, reports, *233 minutes of business meetings, or other evidence was presented to document the purpose or result of the trip. Neither TABCO nor its successor Whiting entered the European market during the period that petitioner was associated with those companies, but Whiting eventually did enter this market. During the early days of ABM's existence, the petitioner was financing the company to a limited extent and paid its rental expenses and other incidental business expenses. Petitioner deducted these expenses on his 1956 tax return. The deductions taken by petitioner were disallowed, and he paid an income tax deficiency in the amount of $990.46. Subsequently, petitioner applied to ABM for reimbursement of the amount claimed by him which had been disallowed on petitioner's 1956 income tax return. On January 30, 1959, a reimbursement in the amount of $990.46 was made to petitioner by ABM. Petitioner claimed that the reimbursement was not for the income tax deficiency but was a settlement of the expenses which he had paid. ABM paid a legal fee to the law firm of Davies, Hardy, and Schenck on March 14, 1958 in the amount of $505.81 for 472 professional services rendered in the suit of petitioner *234 against Jack Lewis and Franklin D. Roosevelt, Jr. Petitioner claimed that the legal fee was paid for legal services rendered in an effort to enforce a stock-purchase option held by the petitioner. Prior to 1958, the petitioner and Crandall decided to have ABM attempt to acquire control of James McCutcheon & Co. (hereinafter referred to as "McCutcheon"). Under the petitioner's plan, the controlling shareholders of McCutcheon were to sell their shares to Lewis who was, in turn, to give an option to petitioner to purchase the shares. Petitioner indicated that Lewis was used because he had the cash to purchase it. The option was granted to petitioner and not to ABM because the seller did not want to sell to ABM. Petitioner had an understanding with Crandall and others that, upon receipt, these shares would become the property of ABM. After Lewis acquired the shares, petitioner became chairman of the board of directors of McCutcheon and Crandall became a director. Lewis then refused to allow the petitioner to exercise his option to acquire the stock. The law firm of Davies, Hardy, and Schenck was retained to bring legal action against Lewis to compel him to honor the option. The suit *235 was suspended when Lewis left the country with the funds of McCutcheon and the company went into bankruptcy. On April 10, 1959, ABM paid $107.02 for 957 prior preference shares of McCutcheon and for 5 shares of that company's common stock, all of which were issued in the name of the petitioner. Mrs. Erickson, from whom the stock was purchased, would not sell the stock to ABM. Petitioner therefore purchased the stock and immediately assigned it to ABM. The stock certificates, representing the McCutcheon stock purchased through Wood, Walker & Co., bear undated assignments from petitioner to ABM. Petitioner had possession of the certificates since they were worthless at the time of purchase and ABM returned them to petitioner to keep as a memento. On January 30, 1959, petitioner paid $1 per share for 124 shares of Capital Class A (non-voting, par value $1) common stock in ABM, a New Jersey corporation. On the same date, a prospective employee and prospective officer of ABM, Robert V. Dilley, purchased 250 shares of such stock at $4 per share. The stock was issued as the result of a decision to terminate the corporation as a New York company and reorganize in New Jersey. Petitioner *236 and Crandall each held 50 percent of the voting stock of ABM. Petitioner was never an employee or officer of ABM and he was never paid a salary. ABM had never paid a dividend and had not had any profits at the time of this stock sale. Dilley had no business affiliation with ABM prior to his purchase of its stock. Dilley was willing to pay $4 per share for the stock in order to establish an equity interest in the company. Petitioner indicated that Dilley agreed with Crandall and himself that it "would be fair form [for him] to pay four dollars per share for the stock." During the years 1959, 1960, and for the first 5 months of the year 1961, petitioner owned and used a Cadillac automobile. This Cadillac automobile was acquired on or about December 1, 1958 at a cost of $5,972. For the period June 1 through December 31, 1961, petitioner also owned and used a Ford automobile. This Ford automobile was acquired on June 1, 1961 at a cost of $2,843. Each of these automobiles had a useful life of 4 years. Petitioner used the straightline method in claiming depreciation for these automobiles on his income tax returns for the years 1959, 1960, and 1961. In addition to depreciation, *237 petitioner incurred and paid the following amounts of expense in connection with the use of the Cadillac and Ford automobiles: Year
Amount
1959
$1,286.67
1960
1,220.84
1961
1,276.81
Petitioner claimed that he used his automobile in business to call on customers, to meet sales representatives in the field, and to visit the company's plants. Petitioner also claimed that he drove to New York, Philadelphia, and the Cresco facility to which he had moved his office in August of 1961. Petitioner estimated that 75 percent of the total use of such automobiles was for business purposes and claimed 75 percent of the depreciation and other expenses for these automobiles as deductions on his income tax returns for each of the years in question. A portion of these total deductions was disallowed by the respondent as follows: 473 Claimed Amount
Disallowed
Year
of Deductions
Amount
1959
$1,930.40
$ 570.03
1960
2,035.47
1,764.07
1961
1,890.76
1,638.66
During the years 1959, 1960, and 1961, petitioner maintained his home in Princeton, New Jersey. The following amounts for the years specified were expended by the petitioner in the *238 maintenance of his home: Total Residen-
Year
tial Expenses
1959
$4,523.55
1960
4,588.00
1961
3,115.51
For each of these years, petitioner claimed that a business office was maintained in his home and deducted a portion of the amounts indicated above for the expense of maintaining such an office. The Commissioner disallowed a portion of such claimed expenses. The amounts claimed and disallowed were as follows: Amount of
Amount of
Office Expense
Office Expense
Year
Claimed
Disallowed
1959
$1,507.85
$942.41
1960
573.50
573.50
1961
389.43
389.43
Ultimate Findings of Fact 1) The lease of property by petitioner to a corporation, 50 percent of the stock of which was owned by petitioner, was a valid lease. (2) Property leased by petitioner to a corporation, 50 percent of the stock of which was owned by petitioner, was utilized 60 percent for business and 40 percent for the personal activities of the petitioner. (3) Payment of petitioner's European travel expense by a corporation, 50 percent of which was owned by petitioner, was a payment of petitioner's personal expense. (4) Petitioner has failed to rebut the *239 presumptive correctness of respondent's determination that the payment to him by a corporation, 50 percent of the stock of which was owned by petitioner, in an amount equal to a deficiency in petitioner's income tax was payment of a personal expense of the petitioner. (5) A corporation, 50 percent of which was owned by petitioner, was the sole beneficiary of legal fees which it expended in the name of the petitioner in attempting to enforce an option. The corporation was also the only beneficiary of a stock purchase in which the corporation paid for the stock and the stock was initially issued in the name of the petitioner. (6) There was no bargain purchase of stock by the petitioner. (7) Petitioner is not entitled to deduct automobile expenses beyond that portion allowed by the respondent for each of the years in question. (8) Petitioner is entitled to deduct a protion of home office expenses for each of the years in question. With respect to 1959, he is entitled to deduct only that portion allowed by the respondent. With respect to 1960, petitioner is entitled to deduct an amount equal to that allowed by the respondent for 1959. With respect to 1961, petitioner is entitled *240 to deduct an amount equal to that allowed by respondent in 1959 limited to the amount which he claimed as a home office expense in his 1961 return. Opinion I. Skytop Residence In 1959, petitioner purchased a residence at Skytop, Pennsylvania. This property was then leased to TABCO. Soon afterward, TABCO assigned the lease to Whiting when Whiting assumed the business of TABCO. The lease was for a period of 5 years at $6,000 per year and was terminable by either party on 30-days notice. During the years in question, petitioner owned one-half of the outstanding stock of TABCO and the successor corporation, Whiting. Petitioner was employed by TABCO, and later Whiting, as chief executive officer, officer in charge of sales and sales promotion, and was chairman of the board of directors of each of the corporations. After receiving the assignment of the Skytop lease, whiting made permanent improvements to the facility including painting, carpeting, and additions of rooms, and remodeling in general. Furthermore, Whiting paid the operating expenses of Skytop during the years in question. During the years 1959, 1960, and 1961 (the years here in question), petitioner claimed deductions *241 on his income tax returns for expenditures for maintenance and repairs on the Skytop facility and for depreciation. In 1961, the petitioner also claimed an additional deduction for food and other items which he purchased for use at Skytop. Respondent argues that Skytop was the personal residence of the taxpayer and that 474 it was used by him as a personal entertainment facility. On this basis, respondent concludes that expenditures made by Whiting with respect to the Skytop facility represented payment of petitioner's personal expenses and resulted in income to petitioner and that petitioner's expenses associated with such property were nondeductible personal expenditures. Petitioner contends that the facility was purchased by petitioner to be leased to TABCO (and later to Whiting by assignment) for use as a corporate training and meeting site and for sales promotion and that it was utilized by the corporation exclusively for these purposes. He also contends, citing M.E. Blatt Co. v. United States, 305 U.S. 267 (1938), that improvements by the lessee to the leasehold do not result in income to the lessor in the year of installation and that under section 109 *242 the gross income of a lessor does not include income, other than rent, derived by the lessor from the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee. For these reasons, petitioner concludes that amounts spent by TABCO and Whiting for operating expenses and improvements were not income to petitioner and that petitioner should be allowed deductions for depreciation on the Skytop facility and for his maintenance and repair expenses during the years in question. Petitioner also argues that with respect to 1961 he should be allowed deductions for food and other items which he purchased for use at Skytop in that such expenses were incurred while petitioner was acting in his capacity as chief executive officer of Whiting. Petitioner testified that the Cresco house was used for four different types of "occasions." These occasions consisted of morning, afternoon, and evening meetings of company officials, breakfast, lunch, or dinner meetings of company officials or with those with whom Whiting did business, sales and training meetings, and cocktails or receptions for people in the area. Petitioner *243 testified that in 1960 customers or prospective customers were entertained on 33 occasions, that there were 11 sales meetings, that there were 39 meetings dealing with the conduct of the corporate business, and that he used the house alone or with other officials to study and prepare reports on 40 occasions. In regards to 1961, petitioner testified that the house was used for the entertainment of customers or company officials on 128 occasions, that there were 33 business meetings with customers, prospective customers, or suppliers, that there were 62 meetings with company executives, and that the facility was used for study on 61 occasions. To support his assertion that the Cresco facility was used solely for business, petitioner introduced into evidence his diaries for each of the years in issue. Petitioner testified that the diaries were kept on a daily basis and that he recorded in them the occasions when he was at the Cresco property. Petitioner's diaries contain numerous references to the property. Frequently, the single notation "Skytop" is utilized. In other entries, this notation is accompanied by names or initials designating other individuals, such as Whiting, executives *244 and businessmen in the area, Mr. Charles Anable (a Whiting executive and petitioner's brother-in-law), petitioner's son (a Whiting official), and petitioner's wife. In addition to the diaries, petitioner introduced "summaries" of the diaries purporting to be a detailed narrative of the daily events at Cresco. The "summaries" were compiled in preparation for trial at the suggestion of petitioner's counsel. The "summaries" were received into evidence with the understanding that they were a clear, concise, and more accessible compilation of the information in petitioner's diaries. The "summaries" contain much greater detail than the diaries and go far beyond the limited purpose which was the basis of their admission into evidence setting forth not only who was at Cresco and whether they had lunch, cocktails, played golf, or attended a reception, but also that meetings were held at specified times during the stated day and the subject matter of those meetings. As to diary entries which show only that petitioner was at the Cresco property alone, the "summaries" purported to detail what reports were studied, what figures were compiled, and what drafts were prepared. In addition, where *245 the diaries indicated that petitioner's wife or daughter was at the facility, the "summaries" often indicated that the family member arrived late, stayed a short time, and left early. 475 Petitioner did not testify from his diaries, and he did not specifically identify any diary entry with respect to one of the four types of "occasions" outlined above. Except for his testimony that the property was utilized solely for business, he did not identify or define the criteria which he used to determine business as opposed to personal use. In utilizing the Cresco property, petitioner quite often served as host. Petitioner stated that others, principally Mr. Charles Anable, occasionally served as host. In addition to serving as host, petitioner also often occupied the house alone. He testified that on these occasions, he used the facility for research, study, and to design materials. He did not indicate what constituted study or research or how much time he spent on such endeavors during any particular stay at the facility. Petitioner also introduced into evidence lists for the years 1960 and 1961, purporting to be alphabetical and chronological lists of people entertained at Cresco, *246 and lists of business contracts made as a result of the existence and utilization of the Cresco facility. The lists of people at Cresco only identify those who were purportedly there and the dates. An examination of the lists reveals that the most frequent guests were R.C. Conole (petitioner's son and an officer of Whiting), Mr. Charles Anable, and Crandall. Petitioner testified that his wife took no part in the selection of the Cresco property, other than joining him as a formal party in the purchase and lease. He also testified that she was not consulted at all regarding the improvements made to the property or the new furnishings purchased for it. Petitioner testified that his wife did not visit the Cresco facility until 4 months after its purchase and visited the property with petitioner on only two occasions, during the day, in 1959. Petitioner further testified that in 1960 and 1961 his wife visited Cresco on only a very few occasions and seldom stayed overnight. Petitioner indicated that on these occasions, the wives of other officers, employees, customers, or prospective customers were also in attendance. Petitioner testified that in 1959 his daughter visited the property *247 on only one occasion, in the month of October, and did not stay overnight. After a thorough consideration of all the facts and circumstances of this case, we conclude that neither petitioner's nor respondent's position can be sustained. We have found that the lease of the property by the petitioner was a valid lease and not a sham, and in his brief, the respondent concedes that the residence was used in part for business purposes. On the other hand, giving full effect to the testimony and evidence (limited to the purposes for which said evidence was admitted) presented by the petitioner, it is clear that in petitioner's mind the distinction between personal and business activities was not clearly defined, and the petitioner has not set forth the objective criteria which he used to determine which activities were personal and which were business. In these circumstances, there can be no clear-cut distinction between petitioner's personal and social activities and his business activities, and it cannot be said that the acquisition and use of this property was solely for business purposes for the benefit of the corporation. Expenditures such as those made with respect to the Skytop *248 facility can serve a dual purpose of promoting and conducting a business and providing payment of what in essence are personal living expenses of an individual. Where such expenditures do serve such a dual purpose, allocation becomes both appropriate and necessary. Heuer, Jr. v. Commissioner, 283 F. 2d 865 (C.A. 5, 1960), affirming per curiam 32 T.C. 947 (1959); International Artists, Ltd., 55 T.C. 94 (1970). Generally, the allocation depends on a comparative analysis between the personal and business utilization of the property. However, where, as in the case before us, such a comparison does not result in a clear and exact measurement of the ratio of time and/or space devoted to business as compared with total use, allocation remains proper and can be made on the basis of an analysis of all the facts and circumstances of the case. International Artists, Ltd., supra. In making such an allocation, we are aware of the heavy burden of proof placed upon the petitioner to demonstrate which of the expenditures and deductions in question *249 were intimately related to the conduct of the corporate business. Louis Greenspon, 23 T.C. 138 (1954), modified 229 F. 2d 947 (C.A. 8, 1956). We also recognize that as a result of this burden of proof, the allocation may bear heavily against the petitioner. Cohan v. Commissioner, 39 F. 2d 476 540 (C.A. 2, 1930), affirming in part 11 B.T.A. 743 (1928). Nevertheless, the allocation should still be made. Heuer, Jr. v. Commissioner, supra; Cohan v. Commissioner, supra; and International Artists, Ltd., supra. Accordingly, we have exercised our best judgment, and on the basis of the entire record, it is our conclusion that the activities and expenses attributable to this property should properly be classified as 60 percent business and 40 percent personal or social. Having made this allocation, it is still necessary to determine the amount to charge to the petitioner's income for the cost of his personal use of the facility which was borne by the corporation. It is also necessary to determine the amount and extent to which he should be allowed to take the deductions attributable to the property. In making these *250 determinations, we emphasize that we accept the validity of the lease between petitioner and TABCO, and later Whiting. The following method sets forth our determinations and provides for the proper disposition of each of the issues with respect to Skytop in accordance with our allocation: (1) In each of the years 1959, 1960, and 1961, the amounts received by petitioner from TABCO or Whiting with respect to the property designated in the lease are to be treated as rental income (not as "Other Income") to the petitioner less deductions for repairs and maintenance paid by the petitioner and for depreciation. The resulting net rental income for each of the years in question is as follows: Gross Rental
Repairs and
Net Rental
Year
Income
Depreciation
Maintenance
Income
1959
$6,000.00
$4,650.00
$1,899.16
($ 549.16)
1960
4,500.00
2,664.73
567.90
1,267.37
1961
3,500.00
2,664.73
1,177.73
(342.46)
(2) In each of the years in question, the petitioner is chargeable with the value of the benefit he derived from the use of the Cresco facility for his personal activities. We have determined that 40 percent of the use of the facility was for *251 petitioner's personal activities. In the absence of any other suitable basis of measurement, we deem that the total cost of the facility to TABCO, and later Whiting, is an appropriate basis for the measurement of the value of the benefit derived. Therefore, 40 percent of the total cost of the facility to TABCO, and later Whiting, is the value of the benefit which petitioner derived from the use of the facility for his personal activities. Thus, in each of the years in question, the total deductible costs or expenses incurred by TABCO, and later Whiting, in connection with the rental and operation of the Cresco facility is to be determined. This includes rent paid by TABCO and Whiting to petitioner, amortization of the leasehold improvements made by TABCO and Whiting, and operating expenses paid directly by TABCO and Whiting. Then, in each of the years in question, 40 percent of this total cost of operation is to be allocated to the petitioner. The result is the amount which is to be treated as a personal expense of the petitioner paid for by TABCO, and later Whiting, and which is therefore income to the petitioner. The application of this formula and the amounts of income to petitioner *252 derived from its application can be seen in the following: *13
Year and Amount
Item
1959
1960
1961
Rent
$ 6,000.00
$ 4,500.00
$ 3,500.00
Wages Paid for Domestic Service-Caretaker and Housekeeper
4,160.00
4,680.00
Social Security for Domestics
124.80
140.40
Fuel, Food, and Other Operating Expenses
2,598.55
2,058.54
1,032.21
Station Wagon
2,173.20
Snow Plow
416.00
Amortization of Leasehold Improvements
1959 Improvements
4,977.03
6,636.03
6,636.03
1960 Improvements
851.40
851.40
1961 Improvements
1,822.20
Total Cost to TABCO and Whiting
$13,575.58
$18,330.77
$21,251.44
Amount of Total Cost to TABCO and Whiting which is Income to the Petitioner (40 per- cent of the Total Cost)
$ 5,430.28
$ 7,332.31
$ 8,500.58 477 (3) In addition, with respect to 1961, petitioner is to be allowed 60 percent of the claimed deduction of $3,039.33 for his expenditures (reimbursed by Whiting) for food and beverages provided for consumption at the facility. The amount of his deduction in this regard is $1,823.60. II. European Trip Respondent argues that the payment by TABCO of the expenses of petitioner's trip to *253 Europe was a payment of petitioner's personal expenses and that such a payment constitutes income to petitioner under section 61(a). [3] Petitioner, of course, argues that payment of these expenses was not income to him in that the expenses were incurred for a valid corporate purpose. Generally, the economic benefit of having expenses paid by the company is taxable to the recipient "only when the payment of expenses serves no legitimate corporate purpose." United States v. Gotcher, 401 F. 2d 118, 123 (C.A. 5, 1968); see also Commissioner v. Riss, 374 F. 2d 161 (C.A. 8, 1967), affirming in part and reversing in part a Memorandum Opinion of this Court. Thus, it is necessary to examine the primary purpose of the expenses which, in turn, involves an analysis of the intention of the payor of the expenses. In essence, the resolution of this issue depends on whether petitioner has demonstrated that his European trip served a legitimate corporate purpose. *254 United States v. Gotcher, supra.We find that the petitioner has failed to meet his burden of proof in this regard. Petitioner testified that the trip was made for TABCO to survey the European market for tabulating cards and to gain information regarding certain card manufacturing machines which were being manufactured in Europe and imported into the United States. He indicated that he traveled to eight of the major financial centers and principal cities in Europe and held discussions with numerous individuals regarding the tabulating card business. Petitioner's daughter accompanied him on the trip, but he paid her expenses. Petitioner also testified that Crandall, the other 50 percent shareholder of TABCO, suggested the trip and assisted in the comprehensive planning of it. Crandall, on the other hand, testified that while he knew of the trip he did not understand the purpose of it to be that testified to by the petitioner. Crandall also indicated that the trip was not undertaken at his, Crandall's suggestion. Petitioner introduced no formal corporate authorization of the trip or even an informal or formal record of any discussions surrounding the purported corporate *255 decision to make the trip. The record shows no report, written recommendations, or other data that was submitted to the corporation to provide a basis for a decision by the corporation on the question of entry into the European market. In essence, we are presented only with the self serving and contradicted testimony of a principal party in interest in whose mind, as previously discussed, the distinction between personal and corporate activities was not clearly defined. On the facts of this case, such evidence is insufficient to sustain petitioner's burden of proof, and we cannot find that petitioner has shown the existence of a legitimate corporate purpose for the trip. Consequently, we conclude that the expenses of petitioner's trip to Europe paid by TABCO are taxable as additional income to the petitioner. III. Money Paid Petitioner by ABM In 1959, ABM paid petitioner $990.46. This amount is equal to a deficiency in petitioner's income tax for 1956. Respondent argues that this payment was income to petitioner when received in that the corporation paid a personal expense of the petitioner. Petitioner argues that the payment should not be treated as income in that it constituted *256 the partial repayment of an advance made by petitioner on behalf of ABM. Petitioner testified that the payment was not a reimbursement of the 1956 deficiency but that it was a partial reimbursement of corporate expenses paid and claimed by the petitioner which had been disallowed as a deduction. Petitioner indicated that he was not reimbursed in full but that the amount paid, equal to his deficiency, was a settlement. On the basis of all the facts and circumstances bearing on this question, we cannot find that petitioner has rebutted the presumptive correctness of respondent's determination. While this Court may not 478 disregard evidence which is credible, reasonable, uncontradicted and unimpreached, Georgia-Pacific Corporation v. United States, 264 F. 2d 161 (C.A. 5, 1959), the mere unsupported testimony of the petitioner is not sufficient to overcome the presumptive correctness of the Commissioner's determination. Wood v. Commissioner, 338 F. 2d 602 (C.A. 9, 1964); Birnbaum v. Commissioner, 117 F. 2d 395 (C.A. 7, 1941), affirming a Memorandum *257 Opinion of this Court; Hoefle v. Commissioner, 114 F. 2d 713 (C.A. 6, 1940), affirming a Memorandum Opinion of this Court. This rule is particularly applicable to the facts before us where the reimbursement was in the identical amount of petitioner's 1956 income tax deficiency. Petitioner has not demonstrated or testified that the disallowed expenses he incurred were reimbursable when he paid them, and petitioner has produced no objective indicia, beyond his testimony, to support his testimony of a purported business transaction with a viable corporate entity. Therefore, we sustain the Commissioner's determination that the amount of $990.46 paid to petitioner by ABM was income to him in the year paid (1959). IV. & V. The Legal Fee and the McCutcheon Stock Petitioner held an option to purchase stock of James McCutcheon & Co., and a legal action was commenced in the name of the petitioner to enforce his rights under the option. The legal fee incurred in instituting this action was paid by ABM. In the following year, ABM paid for prior preference shares of McCutcheon. The stock was issued to petitioner in his name and bears undated assignments to ABM. Respondent argues *258 that these payments by ABM were for petitioner's personal expenses and were income to him at the time they were made. Petitioner argues that he was a nominee or conduit for the McCutcheon stock. He testified that these transactions were constructed solely to obtain the McCutcheon stock for ABM and that the expenditures made by ABM to enforce the option and to pay for the stock were properly the corporation's expenses. In support of his position, petitioner further testified that he held the option, and later the stock, because the owners would not sell to ABM. Petitioner indicated that as to the option the principal stockholder of McCutcheon would not sell to ABM but would sell to petitioner. Petitioner stated that he did not have the funds to purchase the stock so that he had a Mr. Lewis purchase it and give him the option to buy it. Petitioner testified that Mr. Lewis refused to allow the petitioner to exercise his option and that the suit was brought to enforce his rights so that ABM would obtain the stock. The suit was later suspended when Lewis left the country. As to the stock purchase, petitioner testified the owner would sell to him but not the corporation. He stated *259 that while the stock was first issued in his name, it was assigned to the corporation which also had physical possession of it. He indicated that the shares were returned to him when they became worthless. We sustain the petitioner's position. We find his testimony in support of his arguments credible in this instance. The very fact that ABM paid these expenses supports the view that they were made for the corporation's benefit. The economic realities of the situation indicate that ABM was the only beneficiary of the expenditures in question and that petitioner received no actual economic benefit from the expenditures other than that flowing to him as a shareholder of ABM. VI. Bargain Purchase The respondent determined that petitioner received income in the amount of $375 as a consequence of the fact that petitioner was able to purchase 124 shares of Capital Class A (non-voting, par value $1) common stock of ABM in 1959 at $1 per share. This determination is founded on the fact that on the same date that petitioner made his purchase, a prospective employee and officer of ABM purchased the same class of stock at $4 per share. In essence, respondent argues that the stock was *260 transferred to the petitioner by ABM at a price less than its fair market value as established by the price to the propective employee and that, consequently, the difference between the fair market value, as determined by the respondent, and the price paid by the petitioner is taxable income to the petitioner. There is no basis to find that petitioner realized income as the result of a so-called 479 "bargain purchase." Sale of stock to a prospective employee who might be willing to pay a premium to gain an equity interest of the corporation at a price greater than that paid by corporate insiders does not establish anything. Neither transaction can be determinative of value, and the respondent's measuring rods, and consequently his determination, cannot be sustained. VII. Automobile Expenses On his income tax returns for 1959, 1960, and 1961, petitioner deducted 75 percent of the amounts he expended on his automobile during those years, including depreciation. Respondent has disallowed a portion of these total deductions. Petitioner purportedly maintained a daily diary of his activities *261 during the years in question. These diaries do not contain specific notations as to the mileage traveled with respect to each day. However, they do purport and record the daily activities of the petitioner, setting forth with respect to each day where purportedly traveled and for what purpose. Petitioner studied the diaries, and from the entries showing where he had traveled, he compiled the mileage he purportedly traveled in connection with his business during the years in question. These amounts were as follows: Year
Distance Traveled (miles)
1959
17,775
1960
23,765
1961
* 19,545
This issue involves the same problem as the Skytop facility. It is obvious, if the petitioner visited Skytop as much as claimed, that much of the mileage was attributable to those visits. In order to provide the basis of a deduction for the automobile expenses attributable to the mileage driven to various offices of the corporation beyond that allowed *262 by the respondent, more adequate records than those presented to this Court should have been maintained by the corporation or petitioner or both. With respect to both his visits to Skytop and his other automobile travels, petitioner's support for his deductions consists of petitioner's testimony, which he claims is supported by his diaries, as to the number of miles which he considered to be for business. As to both his testimony and his diaries, it must be said, as noted before, that petitioner's concept of what constitutes a business expense may be at substantial variance with that of this Court. Since we are unable to arrive at a conclusion or to determine the extent to which petitioner's use of the automobile constituted an allowable business expenditure, we must accept the respondent's determination. VIII. Home Office Expenses During 1959, 1960, and 1961, petitioner claimed that a business office was maintained in his home, and in those years, he deducted that portion of the expenses incurred in the maintenance of his home which he claimed were attributable to this home office. The respondent disallowed a portion of the deduction taken on this basis in 1959 and disallowed *263 entirely the deductions taken for the claimed home expenses in 1960 and 1961. With respect to these claimed deductions for home office expenses, petitioner testified that his corporation (TABCO and later Whiting) did not have enough space available and that consequently the entire basement of his home was utilized for company business with a small room, the "maid's room," being utilized as his office. Petitioner testified that the "maid's room" was equipped with office-type furniture, files, and other business oriented apparatus and that it had telephone tie-lines (which were paid for by Whiting) to the main office and the various production plants of Whiting. He further testified that when he was not traveling, he used this office to work on the sales and production programs of Whiting and other matters related to the company's business. We are convinced that petitioner is entitled to some deduction for home office expense in each of the years in question. Without adequate information to make a more accurate allocation, we accept the respondent's determination with respect to 1959. However, with respect to 1960 and 1961, we cannot accept respondent's total disallowance of the *264 claimed deductions, especially where he has allowed some deduction under similar circumstances for 1959. As to 1960, we find that petitioner should be allowed a deduction equal to the amount allowed in 1959. This same formula should apply to 1961, but the deduction is, of course, limited to the amount which the petitioner actually claimed as a home office expense on his 1961 return. Decision will be entered under Rule 50. 480 Footnotes
1. Marjorie A. Conole is a party to this proceeding only by virtue of the joint returns filed by the petitioners for the taxable years in question.↩
2. Crandall has previously been involved in litigation with the petitioner. This litigation is reported in Crandall v. Conole, 230 F. Supp. 705↩ (E. D. Pa. 1964).
*. The amount of $30,538.00 was stipulated by the parties to be the cost of the house.↩
3. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
*. This figure is 3,000 miles less than the distance actually traveled, since this number of miles was driven by the petitioner in commuting between his home and his office after it had been moved to the Cresco property.↩