T.C. Memo. 2004-200

UNITED STATES TAX COURT

JOHN WELLER WOOD, JR., AND MAGDALENA FRANCES WOOD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5259-99, 15992-99.        Filed August 31, 2004.

John Weller Wood, Jr., and Magdalena Frances Wood, pro sese.

<u>Lorianne D. Masano</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and accuracy-related penalties as
follows:

|         |            | Accuracy-related penalty |
| Year    | Deficiency | Sec. 6662(a)             |
|---------|------------|--------------------------|
| 1994    | $23,663    | $4,732                   |
| 1995    | 3,102      | 620                      |
| 1996    | 7,515      | 1,503                    |

After concessions by John Weller Wood (petitioner),[1] the issues to be decided in these cases are:

1.  Whether respondent violated the automatic stay under section 362 of the Bankruptcy Code[2] by auditing petitioner's Forms 1040, U.S. Individual Income Tax Return, and issuing notices of deficiency for 1994, 1995, and 1996;

2.  whether petitioner's capital gain in 1994 on the sale of a house in Warren, New Jersey, was less than the $90,888 determined by respondent;

---

[1]Petitioner concedes that:

1.  For 1994, the amount allowable as an itemized deduction for real estate taxes is $12,835 as determined by respondent, rather than $24,389 as claimed on Schedule A, Itemized Deductions, of the Form 1040, U.S. Individual Income Tax Return;

2.  he is not entitled to deduct losses of $3,431 for 1994 and $809 for 1995 from IDN Distributorship or $1,578 for 1995 from Home Business Services;

3.  for 1996, the amount allowable as a loss from the sale of a Buick LeSabre is $201 as determined by respondent, rather than $19,233 as reported on Form 4797, Sales of Business Property; and

4.  the statute of limitations does not bar assessment of tax for 1994.

[2]Bankruptcy Code references are to 11 U.S.C. (2000).

3. whether petitioner understated the net profits from his consulting business by $24,016 in 1994, $7,037 in 1995, and $13,094 in 1996;

4. (a) whether petitioner is a real estate dealer, and, if so, whether he is entitled to deduct business losses of $121,966 reported in 1994, $72,546 reported in 1995, and $345,223 reported in 1996, or alternatively

(b) if petitioner is not a real estate dealer, then whether he is entitled to (i) deductions on Schedule A, Itemized Deductions, greater than $25,665 in 1994, $45,066 in 1995, and $8,545 in 1996, as allowed by respondent, and (ii) deductions for rental expenses on Schedule E, Supplemental Income and Loss, greater than $13,977, as allowed by respondent for 1994;

5. whether petitioner is entitled to deduct net operating loss carryovers of $18,520 in 1994 and $36,389 in 1996;

6. whether petitioner is liable for self-employment tax of $5,902 for 1994, $3,102 for 1995, and $3,626 for 1996;[3] and

7. whether petitioner is liable for the accuracy-related penalty under section 6662(a)[4] for each of the years at issue.

---

[3]The parties agree that in computing petitioner's Federal income tax liability for each year petitioner may deduct one-half of the self-employment tax.

[4]Unless otherwise noted, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.  The stipulation of facts, the supplemental stipulation of facts, and the exhibits submitted therewith are incorporated herein by this reference.

Petitioner and his wife, Magdalena Frances Wood[5] (Mrs. Wood), resided in Orlando, Florida, when the petitions in these cases were filed.

Petitioner graduated from West Point in 1960 and served in the military until 1977.  In 1967 while he was in Florida attending the Air Ground Operations School at Eglin Air Force Base, petitioner and other officers became shareholders of Miracle Strip Parkway Realty, Inc. (MSPR, Inc.), a corporation organized for the purpose of buying land to be divided into lots.  Approximately 20 persons invested in MSPR, Inc.  At some time before the years at issue, MSPR, Inc., converted to a limited partnership and thereafter was known as Miracle Strip Parkway Realty, Ltd. (MSPR, Ltd.).  Petitioner was a limited partner of MSPR, Ltd.  Over the years, MSPR, Ltd., purchased and sold

---

[5]Magdalena Frances Wood did not appear at the trial in these cases and did not execute the stipulation of facts or the supplemental stipulation of facts.  Respondent filed a motion to dismiss the cases with respect to Mrs. Wood for failure to properly prosecute.  The Court will grant respondent's motion and will dismiss these cases as to her.  See Rule 123(b).

undeveloped land to individuals, real estate companies, and developers.

In 1974, petitioner and Mrs. Wood purchased a house in Annandale, Virginia (the Virginia house), for $57,000. They resided in the Virginia house until petitioner retired from the military in 1977.

In 1976, petitioner and Mrs. Wood purchased undeveloped land in Florida. The land remained undeveloped through the years at issue.

When petitioner retired from the military in 1977, he and Mrs. Wood moved to New Jersey. They sold the Virginia house for $70,000 (incurring closing costs of $3,000 on the sale) and purchased a house in Warren, New Jersey (the New Jersey house), for $87,900 (incurring closing costs of $1,214.25). Petitioner and Mrs. Wood did not report the gain from the sale of the Virginia house on their 1977 Federal income tax return. While living in the New Jersey house, they made capital improvements costing $153,435.

In 1977, petitioner and Mrs. Wood purchased a 1-week timeshare unit in Brookdale, Pennsylvania (the Brookdale timeshare), for $7,900.

After petitioner moved to New Jersey, he was employed first by Lockheed Electronics and then by ITT Avionics. In 1981,

petitioner started a consulting business. He also began a home improvement business, operating under the name "J&M Enterprises". Petitioner's mother owned an apartment in Shrewsbury, New Jersey. Over the years, petitioner repaired, cleaned, managed, and found tenants for that apartment.[6] Petitioner spent approximately 1 week each year maintaining and managing the apartment.

In 1982, petitioner filed a business name certificate with the State of New Jersey, certifying that he was conducting a business under the name "The Logistics Technology Group." The nature of the business was described as defense electronics consulting services, real estate dealer activities, and home improvement services. Petitioner opened a bank account titled "Logistics Technology Group" (the LTG account).

In 1986, petitioner and Mrs. Wood purchased a house in Hilton Head, South Carolina (the South Carolina house), and, in 1987, they purchased a 1-week timeshare unit in Gulfstream, Florida (the Gulfstream timeshare), for $7,900.

In 1988, petitioner and Mrs. Wood purchased land in Boca Raton, Florida, and, in 1989, they hired a builder to construct a home on that property (the Florida house). To help finance the construction of the Florida house, petitioner and Mrs. Wood sold the South Carolina house in 1989.

---

[6]Petitioner began these activities in 1972 and continued them through 1996.

In 1989 and 1990, petitioner generally paid the installments on the New Jersey house mortgage, as well as the taxes and related fees associated with the undeveloped land in Florida, the Brookdale timeshare, and the Gulfstream timeshare, from the LTG account.

Petitioner advertised the New Jersey house for sale and found a buyer. However, the buyer under the contract of sale defaulted, and the sale did not go through. (Petitioner was relying on the proceeds from the sale of the New Jersey house to repay loans for constructing the Florida house.) After the buyer defaulted, petitioner obtained money from his brother ($105,000) and Mrs. Wood's mother ($100,000) to assist with the cost of constructing the Florida house. Petitioner paid an additional $155,000 of the cost and obtained a loan for the balance.

Petitioner and Mrs. Wood moved into the Florida house in August 1990 and listed the New Jersey house for sale with a real estate agent. The real estate agent rented the New Jersey house for petitioner on a month-to-month basis from 1992 until it sold in 1994. A lease, dated March 15, 1993, specified that the New Jersey house would remain on the market for sale and could be shown to prospective buyers by appointment. The lease also provided that, if a contract of sale was accepted, the tenant would be given 90 days' notice to vacate the property.

In 1994, petitioner and Mrs. Wood entered into a contract to sell the undeveloped land in Florida, but the buyer failed to perform under the contract.

On April 29, 1994, petitioner and Mrs. Wood filed for bankruptcy under chapter 11 of the Bankruptcy Code (chapter 11) in the U.S. Bankruptcy Court for the Southern District of Florida (the bankruptcy court). On May 9, 1994, petitioner and Mrs. Wood sold the New Jersey house for $334,000. They incurred $20,300 of expenses related to the sale. Allowable depreciation for the 3-year period the house was rented totaled $9,737.

On September 13, 1994, the Internal Revenue Service (IRS) filed with the bankruptcy court a proof of claim, claiming an unsecured nonpriority claim of $2,200 and an unsecured priority claim of $20,389.54.

On January 18, 1995, petitioner and Mrs. Wood filed with the bankruptcy court their chapter 11 plan of reorganization. Pursuant to the plan, the bankruptcy court retained jurisdiction of the case until all payments and distributions called for under the plan had been made. The plan noted that the Florida house had been listed with a licensed realtor for sale for $994,900.

By order dated February 6, 1995, the bankruptcy court confirmed the plan of reorganization. The order confirming the plan proclaimed:

> that, except as provided in the Plan, the individual
> Debtors are discharged from any debt that arose before

the date of confirmation of the Plan, except any debts excepted from discharge under § 523 of the Bankruptcy Code, and except if the Debtors would be denied a discharge under § 727(a) of a chapter 7 case; * * *

On May 18, 1995, the bankruptcy court issued its final decree and closed the bankruptcy case.

Petitioner and Mrs. Wood resided in the Florida house until January 1996, when the mortgage was foreclosed. They continued to own the undeveloped land in Florida, the Brookdale timeshare, and the Gulfstream timeshare throughout 1996.

On their 1994, 1995, and 1996 Forms 1040, U.S. Individual Income Tax Return, petitioner and Mrs. Wood reported the following:

|  | 1994 | 1995 | 1996 |
| --- | --- | --- | --- |
| Income |  |  |  |
| Wages, salaries, tips, etc. | -- | -- | $1,442 |
| Taxable interest | $408 | $86 | 908 |
| Business income or (loss)--Schedule C | (107,644) | (58,440) | (334,232) |
| Capital gain or (loss)--Schedule D | 76,771 | -- | -- |
| Other gains or (losses)--Form 4797 | -0- | -- | (20,581) |
| Pensions & annuities--taxable amount | 21,372 | 21,965 | 22,544 |
| Other income | -- | -- | (36,389) |
| Total income | (9,093) | (36,389) | (366,308) |
| Schedule A |  |  |  |
| Medical & dental | 1,365 | -- | -- |
| Taxes |  |  |  |
| Real estate taxes | 24,389 | 11,610 | -- |
| Personal property taxes | 35 | -- | -- |
| Home mortgage interest | 42,614 | 23,476 | -- |
| Total itemized deductions | 68,403 | 35,086 | -- |
| Itemized deductions/Standard deduction | 68,403 | 35,086 | 6,700 |
| Taxable income | -0- | -0- | -0- |

The capital gain reported in 1994 was gain on the sale of the New Jersey house.

The business income reported each year was attributable to three activities that were reported on separate Schedules C, Profit or Loss From Business--one for Mr. Wood's consulting business (the consulting business Schedule C), one for his property management/real estate activity (the property management Schedule C), and one for a distributorship (the distributorship Schedule C).  The Schedules C reported aggregate net operating losses each year as follows:

|                                  | 1994      | 1995      | 1996        |
|----------------------------------|-----------|-----------|-------------|
| Consulting business Schedule C   |           |           |             |
| Income                           | 75,657    | 53,804    | 60,072      |
| Expenses                         | (51,879)  | (27,527)  | (42,829)    |
| Expense for business use of home | (6,025)   | (11,362)  | (4,674)     |
| Net profit                       | 17,753    | 14,915    | 12,569      |
| Property management Schedule C   |           |           |             |
| Income[1]                        | -0-       | -0-       | (336,981)   |
| Expenses                         |           |           |             |
| Depreciation                     | 3,536     | 27,525    | --          |
| Insurance                        | 148       | --        | --          |
| Mortgage interest                | 106,322   | 33,487    | --          |
| Other interest                   | --        | 1,357     | 8,242       |
| Legal                            | 283       | 500       | --          |
| Office expense                   | 236       | --        | --          |
| Repairs and maintenance          | 7,196     | --        | --          |
| Taxes and licenses               | 3,659     | 9,677     | --          |
| Travel                           | 586       | --        | --          |
| Total                            | 121,966   | 72,546    | 8,242       |
| Net profit (loss)                | (121,966) | (72,546)  | (345,223)   |
| Distributorship Schedule C       |           |           |             |
| Income                           | (776)     | -0-       | -0-         |
| Expenses                         | (2,655)   | (809)     | (1,578)     |
| Net profit (loss)                | (3,431)   | (809)     | (1,578)     |

[1]For 1994 and 1995, petitioner reported no inventory at the beginning and close of each year with respect to the property management and real estate dealership business. For 1996, he reported opening inventory of $355,966 and closing inventory of $18,985 for which he reported cost of goods sold of $336,981. Petitioner did not attach an explanation as to why the 1996 beginning year inventory was different from the 1995 closing inventory.

In December 1997, the IRS began an examination of petitioner's 1994-96 returns. On December 21, 1998, respondent issued petitioner and Mrs. Wood a notice of deficiency for 1994. On July 19, 1999, respondent issued them a notice of deficiency for 1995-96. In the notices of deficiency, respondent (1) increased the capital gain on the sale of the New Jersey house by $14,117 ($90,888 rather than the $76,771 reported on petitioner's

1994 return), (2) increased petitioner's profits from his consulting business by $24,016 for 1994, $7,037 for 1995, and $13,094 for 1996, consisting of omitted gross receipts and disallowed claimed business expenses, (3) disallowed net losses (for expenses attributable to the New Jersey house, the Florida house, the undeveloped land in Florida, and the timeshares and a loss on the sale of the Florida house) totaling $121,966 in 1994, $72,546 in 1995, and $345,223 in 1996 claimed by petitioner and Mrs. Wood on the property management Schedules C, (4) disallowed losses of $3,431 for 1994, $809 for 1995, and $1,578 for 1995 claimed on the distributorship Schedules C, (5) allowed petitioner deductions on Schedule E for expenses relating to the rental of the New Jersey house before its sale that had been claimed on the property management Schedules C, (6) made adjustments to Schedule A itemized deductions, (7) disallowed $19,032 of the $19,233 loss from the sale of a Buick LeSabre petitioner claimed on Form 4797 of the 1996 return, (8) determined that petitioner was liable for self-employment taxes on the net profit from his consulting business and allowed petitioner a deduction for half of those taxes, (9) allowed petitioner a net operating loss carryover of $18,520 to 1994, and (10) disallowed the net operating loss carryover of $36,389 petitioner claimed on the 1996 return.

OPINION

I.   Violation of Automatic Bankruptcy Stay

This Court has limited jurisdiction, and we may exercise jurisdiction only to the extent authorized by Congress.  Naftel v. Commissioner, 85 T.C. 527, 529 (1985).  Our jurisdiction to redetermine a deficiency depends upon the issuance of a valid notice of deficiency and a timely filed petition.  Rule 13(a), (c); Monge v. Commissioner, 93 T.C. 22, 27 (1989); Normac, Inc. v. Commissioner, 90 T.C. 142, 147 (1988).

Section 6212(a) expressly authorizes the Commissioner, after determining a deficiency, to send a notice of deficiency to the taxpayer by certified or registered mail.  The taxpayer, in turn, generally has 90 days from the date the notice of deficiency is mailed to file a petition in this Court for a redetermination of the deficiency.  Sec. 6213(a).

An exception to the normal 90-day filing period arises where the taxpayer has filed a petition for relief under the Bankruptcy Code.  Sec. 6213(f).  The filing of a bankruptcy petition operates as an automatic stay which precludes the commencement or continuation of proceedings in this Court.  11 U.S.C. sec. 362(a)(8); Kieu v. Commissioner, 105 T.C. 387, 391 (1995); Allison v. Commissioner, 97 T.C. 544, 545 (1991).

Petitioner contends that respondent violated the automatic stay in his chapter 11 bankruptcy proceeding under section 362 of

the Bankruptcy Code by conducting a tax audit and issuing the notices of deficiency.

Section 362(a) of the Bankruptcy Code provides in pertinent part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, * * * operates as a stay, applicable to all entities, of–
>
> *   *   *   *   *   *   *
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
>
> *   *   *   *   *   *   *
>
> (8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor. [11 U.S.C. sec. 362(a).]

A chapter 11 filing, however, does not operate as a stay of either an audit by a governmental unit to determine tax liability or the issuance to the debtor by a governmental unit of a notice of tax deficiency. 11 U.S.C. sec. 362(b)(9)(A) and (B). Thus, during the stay, the IRS may conduct an audit and issue a notice of deficiency to the debtor.

If the IRS issues a notice of deficiency to a taxpayer who has filed a bankruptcy petition, the normal 90-day period for

filing a timely petition with this Court is suspended for the period during which the taxpayer is prohibited by reason of the automatic stay from filing a petition in this Court and for 60 days thereafter.  Sec. 6213(f); Olson v. Commissioner, 86 T.C. 1314, 1318-1319 (1986).

Unless relief from the automatic stay is granted by order of the bankruptcy court, the automatic stay generally remains in effect until the earliest of the closing of the case, dismissal of the case, or the grant or denial of a discharge.[7]  11 U.S.C. sec. 362(c)(2); Guerra v. Commissioner, 110 T.C. 271, 275 (1998); Allison v. Commissioner, supra at 545; Smith v. Commissioner, 96 T.C. 10, 14 (1991); Neilson v. Commissioner, 94 T.C. 1, 8 (1990).

Petitioner filed for bankruptcy on April 29, 1994.  The bankruptcy court confirmed the plan of reorganization by order

---

[7]The period that the automatic stay remains in effect is prescribed in 11 U.S.C. sec. 362(c) as follows:

   (c) Except as provided in subsections (d), (e), and (f) of this section--

   (1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and

   (2) the stay of any other act under subsection (a) of this section continues until the earliest of--
   (A) the time the case is closed;
   (B) the time the case is dismissed; or
   (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

dated February 6, 1995, and closed the case on May 18, 1995. The order confirming the plan specifically discharged petitioner and Mrs. Wood. Therefore, the automatic stay of Bankruptcy Code section 362 was lifted no later than May 18, 1995, when the order closing the case was entered.

Respondent issued to petitioner and Mrs. Wood a notice of deficiency for 1994 on December 21, 1998, and a notice of deficiency for 1995 and 1996 on July 19, 1999. Thus, the notices of deficiency were issued, and the petitions in these cases were filed, well after the automatic stay in petitioner and Mrs. Wood's bankruptcy case was lifted.

Petitioner contends, and asks us to rule, that respondent's claims against him were discharged in bankruptcy. We do not have authority in these cases to decide whether respondent's claims against petitioner have been discharged because in a deficiency proceeding our subject matter jurisdiction is generally limited to the redetermination of the correct amount of a deficiency determined by the Commissioner and is unrelated to the collection of the tax. Swanson v. Commissioner, 65 T.C. 1180, 1184 (1976). An action brought for redetermination of a deficiency "has nothing to do with collection of the tax nor any similarity to an action for collection of a debt". Id. Thus, in deficiency proceedings commenced in this Court under section 6213, such as these cases, while we have jurisdiction to redetermine the

Federal income tax deficiencies, we do not have jurisdiction to determine whether a bankruptcy court has discharged a taxpayer from an unpaid tax liability.  Neilson v. Commissioner, supra at 9; Graham v. Commissioner, 75 T.C. 389, 399 (1980); Bilski v. Commissioner, T.C. Memo. 1994-55; McAlister v. Commissioner, T.C. Memo. 1993-166.[8]

II.  Capital Gain in 1994 on the Sale of New Jersey House

Respondent determined that petitioner's corrected capital gain on the sale of the New Jersey house was not $76,771 (as reported on petitioner's 1994) return but rather $90,888, computed as follows:

---

[8]In contrast to a deficiency proceeding, a lien proceeding commenced in this Court under sec. 6330(d)(1) "is closely related to and has everything to do with collection of a taxpayer's unpaid liability for a taxable year."  Washington v. Commissioner, 120 T.C. 114, 120 (2003).  Thus, this Court has jurisdiction in a lien or levy proceeding commenced under sec. 6330(d)(1) to determine whether a bankruptcy court has discharged the taxpayer from unpaid tax liabilities.  Swanson v. Commissioner, 121 T.C. 111 (2003); Washington v. Commissioner, supra.

- 18 -

| | | |
|---|---|---|
| Sale price | $334,000 | |
| Closing costs | (20,300) | |
| Amount realized | | $313,700 |
| Purchase price | 87,900 | |
| Closing costs | 1,214 | |
| Improvements | 153,435 | |
| Cost basis | | $242,549 |
| Depreciation allowed | | |
| 1992 | 3,455 | |
| 1993 | 3,455 | |
| 1994 | 2,827 | |
| Total | | (9,737) |
| Deferred gain from sale of Virginia house | | |
| Sale price | 70,000 | |
| Cost | (57,000) | |
| Closing costs | (3,000) | |
| Deferred gain | | (10,000) |
| Adjusted basis | | (222,812) |
| Gain on sale | | 90,888 |

Respondent increased petitioner's cost basis in the New
Jersey house by $153,435 for improvements petitioner made to the
house.  Respondent included in the improvements to the New Jersey
house $20,000 petitioner established he incurred in 1984 for
modifications to the kitchen.  Petitioner asserts that he spent
$22,500 for modifications to the kitchen of the New Jersey house.

Respondent's determinations are presumed to be correct and
petitioner bears the burden of proof on all issues in these
cases.[9]  See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111,

_____

[9]Sec. 7491, which is effective for court proceedings arising
in connection with examinations commencing after July 22, 1998,
shifts the burden of proof to the Commissioner in certain
circumstances and places on the Commissioner the burden of
production with respect to penalties and additions to tax.  Sec.
7491 is inapplicable in these cases because the examination of
petitioner and Mrs. Wood's returns commenced in December 1997.

115 (1933). Petitioner has not established that he paid more for kitchen remodeling than the $20,000 respondent allowed. He provided two documents from Frank and Sal Fricano for material and labor for "tiling kitchen & foyer".[10] Both documents provide for tiling an area of 305 square feet. The documents could be estimates rather than invoices, and they do not establish that the work was completed or that the stated amounts were paid.

Petitioner asserts that he spent several thousand dollars to add fireplaces to the New Jersey house. He did not provide any checks or receipts to substantiate the cost of the fireplaces.

We find that petitioner has not established that the capital improvements he and Mrs. Wood made to the New Jersey house totaled more than $153,435. We sustain respondent's determination on this issue.

III. Net Profits From Petitioner's Consulting Business

For the years at issue, petitioner reported the following on the consulting business Schedules C:

|  | 1994 | 1995 | 1996 |
| --- | --- | --- | --- |
| Income | $75,657 | $53,804 | $60,072 |
| Expenses | (51,879) | (27,527) | (42,829) |
| Expense for business use of | (6,025) | (11,362) | (4,674) |
| Net profit | 17,753 | 14,915 | 12,569 |

---

[10]One is clearly dated "June 5 - 84". The second document is also dated June 5 but it appears the "84" has been changed to "85".

Respondent determined that petitioner's profits from his consulting business should be increased by $24,016 for 1994, $7,037 for 1995, and $13,094 for 1996, consisting of omitted gross receipts and disallowed claimed business expenses.

In addition to compensation for his consulting services, petitioner received reimbursement from his clients for expenses. The reimbursements were not included in the compensation reported on Forms 1099 issued by the clients but were deducted by petitioner on the consulting business Schedules C. Petitioner did not keep accurate records of his reimbursed expenses. The invoices he submitted to the clients did not match deposits made into his bank accounts. During the audit, petitioner identified certain deposits as amounts he received from clients for services and reimbursed expenses (the consulting business deposits).

In computing the gross receipts from petitioner's consulting business, respondent used the specific items method; i.e., the consulting business deposits. The consulting business deposits totaled $83,966 in 1994, $56,066 in 1995, and $63,651 in 1996. At trial petitioner offered no evidence to establish that the deposits were not amounts paid to him by his clients or were nontaxable amounts. We find that petitioner's gross receipts from the consulting business were as determined by respondent; namely $83,966 in 1994, $56,066 in 1995, and $63,651 in 1996.

The parties stipulated that petitioner's total business expenses allowable on the consulting business Schedules C were $42,197 for 1994, $34,114 for 1995, and $37,988 for 1996, as respondent determined in the notices of deficiency.

We thus hold that petitioner had additional profits from his consulting business of $24,016 for 1994, $7,037 for 1995, and $13,094 for 1996, computed as follows:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| Gross receipts | $83,966 | $56,066 | $63,651 |
| Expenses |  |  |  |
| Net profit | 41,769 | 21,952 | 25,663 |
| Less net profit reported on return | (17,753) |  |  |
| Additional profits | 24,016 | 7,037 | 13,094 |

IV. Business Losses as Real Estate Dealers

For the years at issue, petitioner and Mrs. Wood claimed deductions on the property management Schedules C for expenses (that resulted in net losses) related to their ownership of real property, including the New Jersey house, the Florida house, the undeveloped land in Florida, the Brookdale timeshare, and the Gulfstream timeshare, and petitioner's management of the apartment owned by his mother. In addition, in 1996, they claimed a business loss on the sale of the Florida house.

Respondent disallowed the net losses petitioner claimed on the property management Schedules C ($121,966 in 1994, $72,546 in 1995, and $345,223 in 1996) because petitioner did not establish, alternatively, (1) that he and Mrs. Wood were in the property

management business during the years at issue, (2) that the activities were entered into for profit within the meaning of section 183, or (3) that any amount was for an ordinary and necessary business expense or was expended for the purpose designated.

Respondent, however, treated the New Jersey house as property held for the production of income and, pursuant to section 212,[11] allowed petitioner deductions on Schedule E for claimed expenses relating to the rental of the New Jersey house before its sale. Respondent also allowed deductions on Schedule A for State and local property taxes for all other properties, pursuant to section 164, and for interest paid on the Florida house mortgage, pursuant to section 163(h).

Petitioner contends that he and Mrs. Wood were real estate dealers and thus the expenses and loss incurred in that business are deductible under sections 162 and 165. On the other hand, respondent asserts that the expenses and loss on the foreclosure of the Florida house are nondeductible personal expenses and loss.

---

[11]An individual is entitled to deduct all the ordinary and necessary expenses paid or incurred during the taxable year "for the management, conservation, or maintenance of property held for the production of income". Sec. 212(2).

A.    Expenses

Taxpayers generally may deduct expenses that are ordinary and necessary in carrying on a trade or business.  Sec. 162(a).  Also, taxpayers generally may deduct expenses that are ordinary and necessary for (1) the production or collection of income, or (2) the management, conservation, or maintenance of property held for the production of income.  Sec. 212(1) and (2).  Further, while business expenses and expenses related to income-producing property are currently deductible, a taxpayer is not entitled to deduct a capital expenditure; i.e., an amount paid for new property or for permanent improvements or betterments made to increase the value of any property or estate.[12]  Sec. 263(a)(1).  Instead, a depreciation deduction may be allowed if the property is used in a trade or business or held for the production of income.  Sec. 167; see INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83-84 (1992).  Personal, living, and family expenses, on the other hand, may not be deducted unless the Internal Revenue Code expressly provides otherwise; e.g., State and local real property taxes are deductible pursuant to section 164(a)(1).  Sec. 262(a).  The statutory prohibitions of sections 262 and 263 regarding deductibility of personal and capital expenses take precedence over the allowance provisions of sections 162 and 212.

_____

[12]Generally, the cost of acquisition of property having a useful life substantially beyond the taxable year is a capital expenditure.  Sec. 1.263(a)-2(a), Income Tax Regs.

Commissioner v. Idaho Power Co., 418 U.S. 1, 17 (1974); Sharon v. Commissioner, 66 T.C. 515, 523 (1976), affd. 591 F.2d 1273 (9th Cir. 1978).

To be deductible under section 162(a), an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense (rather than a capital expenditure), (4) be a necessary expense, and (5) be an ordinary expense. Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971). Here, we are primarily concerned with the second requirement; i.e., whether petitioner and Mrs. Wood incurred the disallowed expenses while carrying on a trade or business.

Petitioner contends that he and Mrs. Wood were in the trade or business of dealing in real estate. He asserts that their intent and commitment to be real estate dealers is evidenced by (1) petitioner's promoter activities with MSPR, Inc., (2) petitioner's and Mrs. Wood's obtaining real estate licenses, taking real estate education courses, and being employed by a New Jersey real estate development company, (3) petitioner's registering the business name "Logistics Technology Group" in New Jersey, establishing bank accounts in that business name, and paying the expenses of their seven properties from that account, and (4) petitioner's advertising the New Jersey house, the Florida house, and the undeveloped Florida land.

To be engaged in a trade or business the taxpayer must have a good faith expectation of profit although that expectation need not be reasonable.  Burger v. Commissioner, 809 F.2d 355, 358 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  However, as stated by the Supreme Court in Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987):

> not every income-producing and profit-making endeavor
> constitutes a trade or business. * * * to be engaged in
> a trade or business, the taxpayer must be involved in
> the activity with continuity and regularity and * * *
> the taxpayer's primary purpose for engaging in the
> activity must be for income or profit. * * *

Although an individual who is engaged in the business of selling real estate to customers may be characterized as a real estate dealer, an individual who holds real estate for investment or speculation, and receives rentals therefrom, is not a real estate dealer.  Sec. 1.1402(a)-4(a), Income Tax Regs.

Petitioner asserts that he and Mrs. Wood were real estate dealers and that the properties constituted inventory held for sale to customers.  Whether property is held by a taxpayer for sale to customers in the ordinary course of the taxpayer's business or for another purpose is a question of fact, and each property must be considered individually.  Gartrell v. United States, 619 F.2d 1150, 1153 (6th Cir. 1980); Cottle v. Commissioner, 89 T.C. 467, 486-487 (1987).

The taxpayer's primary purpose for holding the property must be determined by reference to his purpose "at some point before he decided to make the sale". Suburban Realty Co. v. United States, 615 F.2d 171, 182 (5th Cir. 1980). Earlier events may be considered in deciding what the taxpayer's primary purpose was at the time of sale. The ownership and maintenance of the property must relate primarily to a business, rather than a social or personal, purpose. Intl. Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970); Chapman v. Commissioner, 48 T.C. 358, 366 (1967).

Over the years, courts have considered a variety of factors in determining the taxpayer's primary purpose for holding property, including (1) the taxpayer's purpose in acquiring the property and the duration of his ownership, (2) the purpose for which the property was subsequently held; (3) the taxpayer's everyday business and the relationship of realty income to total income, (4) the frequency, continuity, and substantiality of sales of property, (5) the extent of developing and improving the property to increase sales, (6) the extent to which the taxpayer used advertising, promotion, or other activities to increase sales, (7) the use of a business office for the sale of property, (8) the character and degree of supervision or control the taxpayer exercised over any representative selling the property, and (9) the time and effort the taxpayer habitually devoted to the sales. United States v. Winthrop, 417 F.2d 905,

910 (5th Cir. 1969); <u>Cottle v. Commissioner</u>, <u>supra</u> at 487;
<u>Raymond v. Commissioner</u>, T.C. Memo. 2001-96; <u>Neal T. Baker
Enters., Inc. v. Commissioner</u>, T.C. Memo. 1998-302; <u>Nadeau v.
Commissioner</u>, T.C. Memo. 1996-427; <u>Tollis v. Commissioner</u>, T.C.
Memo. 1993-63, affd. without published opinion 46 F.3d 1132 (6th
Cir. 1995).  Although these factors may aid the finder of fact in
determining, on the entire record, the taxpayer's primary purpose
for holding property, they have no independent significance and
individual comment on each factor is not necessary or required.
<u>Cottle v. Commissioner</u>, <u>supra</u> at 487-489; see also <u>Suburban
Realty Co. v. United States</u>, <u>supra</u> at 177-179; <u>Hay v.
Commissioner</u>, T.C. Memo. 1992-409.

Petitioner and Mrs. Wood did not purchase and hold the
Virginia house, the New Jersey house, or the Florida house for
sale to customers in the ordinary course of a trade or business.
Petitioner and Mrs. Wood purchased the Virginia house in 1974.
They resided in that house until 1977 when they moved to New
Jersey after petitioner retired from the military.  Petitioner
and Mrs. Wood sold the Virginia house and purchased a new
residence, the New Jersey house.  They lived in the New Jersey
house until 1990 when they moved into their next residence, the
newly constructed Florida house.  After the contract for sale of
the New Jersey house fell through, they rented that house on a
month-to-month basis until it was sold.  To satisfy their

mortgage obligation, they borrowed money from relatives and placed the Florida house on the market.

The timeshares and the South Carolina house were personal vacation properties. They were not listed for sale until funds were needed to pay for the Florida house. These vacation properties were not purchased or held for sale to customers in the ordinary course of business.

Moreover, petitioner's ownership of the undeveloped land in Florida does not establish that petitioner and Mrs. Wood were dealers in real estate. Petitioner and Mrs. Wood purchased the undeveloped land in 1976. In 1994, petitioner and Mrs. Wood entered into a contract to sell that land, but the buyer failed to perform under the contract. The land remained undeveloped, and petitioner continued to own it through 1996. There is no evidence that petitioner offered the land for sale before 1994 or that he ever attempted to develop the land. We conclude that petitioner purchased the land as an investment and not as property held for sale to customers in the ordinary course of business.

Finally, petitioner's investment in MSPR, Ltd., does not establish that he was a dealer in real estate. Petitioner's partnership interest in MSPR, Ltd., was not real property held for sale to customers in the ordinary course of petitioner's business. It is settled law that a partnership is an

independently recognizable entity apart from its partners, and that business conducted by a partnership is considered apart from any business activity conducted by its partners on their own behalves. See, e.g., Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 517 (7th Cir. 1980) (expenses were characterized as "pre-operational costs" of the partnership even though the general partner was already in the same business), affg. 72 T.C. 521 (1979); Brannen v. Commissioner, 78 T.C. 471, 505 (1982) ("the partnership is an independently recognizable entity apart from its partners for the purposes of the calculation of its taxable income under section 703"), affd. 722 F.2d 695 (11th Cir. 1984); see also Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987) (in characterizing partnership income "it is the dominant economic motive of the partnership, not that of the individual investors, that is determinative"), affg. T.C. Memo. 1985-197; Tallal v. Commissioner, 778 F.2d 275, 276 (5th Cir. 1985) ("When the taxpayer is a member of a partnership, we have interpreted 26 U.S.C. § 702(b) to require that business purpose must be assessed at the partnership level."), affg. T.C. Memo. 1984-486. Moreover, petitioner was a limited partner of MSPR, Ltd. He did not actively participate in the conduct of the partnership business.

The frequency of the taxpayer's sales "is highly probative in the real estate context because the presence of frequent sales

ordinarily belies the contention that the property is being held 'for investment' [or for personal purposes] rather than 'for sale.'" Major Realty Corp. & Subs. v. Commissioner, 749 F.2d 1483, 1488 (11th Cir. 1985), affg. in part and revg. in part T.C. Memo. 1981-361.

Petitioner and Mrs. Wood did not make frequent sales of property. Over the 20-year period that included 1977 through 1996, petitioner and Mrs. Wood sold four properties that they owned--the Virginia house in 1977, the North Carolina property in 1989, the New Jersey house in 1994, and the Florida house in 1996.

The infrequency of sales is highly probative that the properties were held for personal or investment reasons rather than for sale. We conclude that the residences, the vacation properties, the undeveloped land in Florida, and the partnership interest in MSPR, Ltd., were not properties purchased or held for sale to customers. We find that petitioner and Mrs. Wood were not real estate dealers and hold, therefore, that the disallowed amounts are not business expenses deductible under section 162.

B.  Loss on Sale of Florida House

Petitioner claimed an ordinary loss on the foreclosure of the Florida house in 1996. Section 165(a) allows a deduction for any loss sustained during the taxable year that is not compensated for by insurance or otherwise. However, in the case

of an individual, section 165(c) limits the deduction to (1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, even though not connected with a trade or business, and (3) losses of property not connected with a trade or business or with a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, subject to limitations set forth in section 165(h).

Petitioner asserts that the Florida house was held primarily for sale to customers in the ordinary course of either (1) his and Mrs. Wood's trade or business as a real estate dealers or (2) their family partnership's business of constructing the house for immediate sale. We have found that petitioner and Mrs. Wood were not real estate dealers. Further, we do not think that the arrangement petitioner had with his brother and Mrs. Wood's mother constituted a partnership that carried on a business.

There is no evidence in the record that a partnership was created. Neither petitioner's brother nor Mrs. Wood's mother testified at the trial in these cases. The records from the bankruptcy proceeding lead us to believe that the funds advanced by petitioner's brother and Mrs. Wood's mother were debts of petitioner and of Mrs. Wood.

Furthermore, the activities of constructing, owning, and selling the Florida house were not carried on as a trade or

business.  Petitioner and Mrs. Wood retained ownership of the Florida house.  They resided in the house.  They never paid any rent to any partnership for their use of the house.  And they claimed the Florida house as their residence in their bankruptcy case.  Considering all the facts and circumstances, we find that the Florida house was not property related to, or used in, any trade or business.

Finally, we note that generally even though people who buy property for their own residential purposes are interested in making a potentially profitable purchase, the purchase or construction of a personal residence is not considered a transaction entered into for profit.  The primary motive of acquiring a family residence brings the purchase within the ambit of section 262, which provides that "no deduction shall be allowed for personal, living, or family expenses."  The regulations under section 165 provide:  "A loss sustained on the sale of residential property purchased or constructed by the taxpayer for use as his personal residence and so used by him up to the time of the sale is not deductible under section 165(a)."  Sec. 1.165-9(a), Income Tax Regs.  The regulations also provide that in order to be allowed a loss on the sale of property which at an earlier time was used as a personal residence, a taxpayer must show that his purpose for owning the residence changed and

that the new purpose was for the production of income. Sec. 1.165-9(b)(1), Income Tax Regs.

Petitioner and Mrs. Wood purchased the Florida lot with the intent to build their personal residence on it. Petitioner and Mrs. Wood used the Florida house as their personal residence until it was sold in 1996. The property was never rented or otherwise changed to income-producing property. See, e.g., Newcombe v. Commissioner, 54 T.C. 1298, 1301-1302 (1970); Newbre v. Commissioner, T.C. Memo. 1971-165.

In sum, we hold that petitioner is not entitled to deduct any loss on the foreclosure of the Florida house. We have considered all of petitioner's arguments regarding the disallowed expenses and loss claimed on the property management Schedules C, and to the extent not specifically addressed, we find them unpersuasive.

## V. Schedule A Itemized Deductions

For 1994, respondent made the following adjustments to the itemized deductions petitioner claimed on the 1994 return:

| 1994 Itemized Deductions | Per Return | Per Exam | Adjustment |
|---|---|---|---|
| Medical & dental | $1,365 | -0- | $1,365 |
| Taxes | 24,424 | $12,456 | 11,968 |
| Home interest | 42,614 | 6,632 | 35,982 |
| Contributions | -0- | 304 | (304) |
| Miscellaneous | -0- | 6,488 | (6,488) |
| AGI limitation | -- | (215) | (215) |
| Total | 68,403 | 25,665 | 42,738 |

For 1995, respondent made the following adjustments to the itemized deductions petitioner claimed on the 1995 return:

| 1995 Itemized Deductions | Per Return | Per Exam | Adjustment |
|---|---|---|---|
| Taxes | $11,610 | $11,865 | ($255) |
| Home mortgage interest | 23,476 | 32,871 | (9,395) |
| Contributions | -0- | 330 | (330) |
| Total | 35,086 | 45,066 | (9,980) |

For 1996, respondent determined that the standard deduction was less than petitioner's itemized deductions and made the following adjustments for itemized deductions:

| 1996 Itemized Deductions | Per Return | Per Exam | Adjustment |
|---|---|---|---|
| Standard deduction | $6,700 | -0- | $6,700 |
| Itemized deductions | | | |
| Taxes | -0- | $303 | (303) |
| Home mortgage interest | -0- | 8,242 | (8,242) |
| Total | 6,700 | 8,545 | (1,845) |

Aside from petitioner's claim that the taxes[13] and mortgage interest were trade or business expenses deductible on Schedules C for his and Mrs. Wood's business as dealers in real estate, petitioner does not challenge respondent's adjustments for itemized deductions. We have found that petitioner and Mrs. Wood are not dealers in real estate, and, therefore, we sustain respondent on this issue.

---

[13]Respondent allowed petitioner to deduct on the consulting business Schedule C 10 percent of the taxes as a home office expense of Mr. Wood's consulting business.

VI.  Schedule E Rental Expenses for 1994.

Petitioner documented taxes of $2,526 on the New Jersey house, which respondent allowed as a rental expense deduction on Schedule E.  Respondent determined that $13,997 of expenses for depreciation, repairs, and other expenses disallowed for 1994 as deductions on property management Schedule C were deductible in 1994 on Schedule E as expenses related to the rental of the New Jersey house.  Aside from his claim that these items were trade or business expenses deductible on Schedules C for the business dealing in real estate, petitioner does not challenge these adjustments.  We have found that petitioner and Mrs. Wood are not dealers in real estate, and, therefore, we sustain respondent on this issue.

VII. Self-Employment Tax and Net Operating Loss Carryovers

Respondent determined that petitioner was liable for self-employment tax of $5,902 in 1994, $3,102 in 1995, and $3,626 in 1996 on the net profit from his consulting business and allowed petitioner a deduction for half of those taxes ($2,951 in 1994, $1,551 in 1995, and $1,813 in 1996).

Respondent also allowed petitioner a net operating loss carryover of $18,520 to 1994 from the examination of earlier years but, on the basis of the adjustments made to 1995, disallowed the net operating loss carryover of $36,389 petitioner claimed on the 1996 return.

Petitioner has not addressed these issues and is deemed to have conceded them. Therefore, we sustain respondent on these issues.

## VIII. Accuracy-Related Penalty Under Section 6662(a)

Respondent determined that petitioner is liable for the accuracy-related penalty under section 6662(a). As pertinent here, section 6662(a) imposes a 20-percent penalty on the portion of an underpayment attributable to negligence or disregard of rules or regulations. Sec. 6662(b)(1). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, including any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

The penalty under section 6662(a) does not apply to any portion of an underpayment of tax if it is shown that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his/her proper tax liability for the year. Id. The good faith reliance on the advice of an independent, competent professional

as to the tax treatment of an item may meet this requirement. Sec. 1.6664-4(b), Income Tax Regs.

Petitioner has made no showing that he made a reasonable attempt to comply with the tax rules and regulations with regard to those deductions he took for the years at issue which have been disallowed. Hence, with respect to those deductions, petitioner has failed to show that he was not negligent. Moreover, petitioner has not shown that he acted in good faith with respect to, or that there was reasonable cause for, the position he took. Further, petitioner does not claim that he relied on a tax professional as to the tax treatment of the expenses and losses at issue, including those related to his personal residences. Petitioner simply asserts that the accuracy-related penalty does not apply because he properly claimed the deductions under section 162(a). We have found to the contrary.

Under these circumstances, we are compelled to hold that petitioner is liable for the accuracy-related penalty for the years at issue.

To reflect the foregoing,

> Decisions will be entered for respondent as to petitioner John Weller Wood, Jr., and orders of dismissal and decision will be entered as to petitioner Magdalena Frances Wood.